## STATE v. DAVID LEWIS HOSKINS.

193 N. W. 2d 802.

January 7, 1972—No. 41663.

112

*C. Paul Jones,* State Public Defender, and *Ronald L. Haskvitz,* Assistant State Public Defender, for appellant.

*Warren Spannaus,* Attorney General, and *James M. Kelley,* Assistant Attorney General, for respondent.

NELSON, JUSTICE.

Appeal from a judgment of conviction and from an order denying a new trial after a jury trial before the Ramsey County District Court, following a change of venue from Stearns County to Ramsey County. Defendant was convicted of one count of murder in the second degree, Minn. St. 609.19, and four counts of murder in the third degree, § 609.195. He was sentenced to 40 years on the conviction of second-degree murder and to 25 years on each conviction of third-degree murder. All sentences were ordered to be served concurrently.

The facts are generally undisputed and, in relevant part, are as follows:

On August 17, 1967, the day of the homicides, defendant, together with his wife, Loretta, their three minor girls, and their infant boy, had been at defendant's father's farm near Kimball, Minnesota. Defendant had been baling straw that day and had worked quite late. Apparently, nothing of any particular significance had happened during the day. In the morning defendant had gone to the bank to deposit a check and to pay a bank loan, and in the afternoon his wife had gone to town to a church ladies' aid meeting.

That evening, defendant and his family ate a late supper around 9 p. m. at his parents' home. While eating, they began to watch a television movie, "Barrabas." At approximately 10 p. m., defendant's wife asked him to take the three older children home and to give them baths and put them to bed, since they appeared to be getting tired. Mrs. Hoskins remained to help with the dishes, keeping the baby with her.

When he arrived home, defendant turned on the television and, together with his daughters, watched the ending of the movie they had started to watch at his parents' home. After the movie was over, the two older girls took showers and defendant gave the youngest girl a bath. He sent the two older girls to bed and was rocking the youngest girl to sleep when his wife arrived home with the baby. While defendant put the youngest daughter

in bed, Mrs. Hoskins prepared the baby for bed and began to nurse it. She and the baby apparently began to fall asleep, so defendant took the baby from his mother's arms and placed him in his crib. By this time defendant's wife was sleeping fairly soundly, and defendant remembers reflecting to himself how peaceful and calm she looked as she slept.

Defendant apparently then obtained his .22-caliber rifle, and the next thing he remembered was standing in the bedroom doorway, the rifle in his hands at shoulder level and blood on the side of his wife's head. He then ran outside of the house and sat down on a lawn chair in the yard, contemplating his deed. His particular thought processes at this juncture are not revealed to us, except to the extent that he attempted to determine a way to cover up his act so that nobody would know what had happened to his wife. Striking upon an arson scheme, defendant obtained some gasoline and splashed it around the house in the first floor bedroom, the dining room, and the living room. Although he did not remember exactly when, he subsequently ignited the gasoline.

By this time defendant had decided it was necessary to be "hurt" himself in order to give credence to his planned story that someone else had shot his wife and burned his home. He went to his garage where he tied the rifle to a stove with a cord attached to the rifle, to trigger it from a remote position, in order to shoot himself. After firing at least one test shot, defendant shot himself twice, once in the shoulder and once in the side. Apparently, he was not trying to kill himself at this point, and took pains to make certain no powder burns were left on his body. He did this in the manner described "[j]ust to make it look like somebody else had done it to me." He then removed the rifle from the garage, carried it to the porch of his house, and threw it into the already burning building. After standing and watching the house burn for an undisclosed length of time, defendant devised a plan to tie himself up some way "so it wouldn't look like [he] had done the rest of it."

Before tying himself up, defendant set fire to the garage to cover up the blood which had dripped from his two wounds. Then, taking a rope from a nearby tree, defendant managed to tie himself to one of two clothesline supports located in the yard. He also put a towel over his head to serve as a blindfold with the "idea of not being able to see anybody that came around. Just part of the story that I made up about somebody being there, and not knowing who they were."

Within a short time, the flames from defendant's house were noticed by several people in the vicinity. Some of them stopped, cut defendant down from the clothesline, and took him to a nearby store where they could summon medical attention and aid from the sheriff and fire department. While at that store and again on the morning of August 18, 1967, at the hospital, defendant told witnesses and law-enforcement agents that he and his family had been besieged by at least four people who shot him, tied him to the clothesline support, and ignited the house and garage.

Further investigation by law-enforcement agents caused them to doubt defendant's story. Subsequent questioning of defendant led to his giving an oral inculpatory statement which later was transcribed. Following a hearing as required by State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 141 N. W. 2d 3 (1965), this statement and one defendant had given subsequently were held admissible. At trial both were read to the jury.

Defendant's second statement not only provided the details of the events at the Hoskins' farm but also exposed an adulterous affair with a married former coemployee, an affair which apparently was current at the time of the homicides. This affair had been openly discussed between defendant and his wife, and the possibility of a divorce had been discussed by them on more than one occasion. Defendant and his paramour had also discussed leaving their respective spouses and going away together.

Two indictments were returned against defendant on August 31, 1967, by the Stearns County grand jury. The first indictment

charged him in the alternative with two counts of murder in the first degree arising from the killing of his wife, and the second indictment charged him with four counts of murder in the first degree arising from the killing of each of his four children. However, as has been indicated, the jury returned a verdict for the lesser offenses of murder in the second degree and murder in the third degree.

Defendant raises the following issues on appeal: (1) Did the trial court err in denying defendant's motion that he be permitted to waive a jury trial? (2) Did the trial court err in refusing to honor an affidavit of prejudice? (3) Was defendant denied due process of law and the right to be confronted by witnesses where a bailiff and a prosecutor allegedly commented upon the case in the presence of the jury? (4) Was defendant denied due process of law where the jury allegedly was unable to obtain additional instructions and three jurors allegedly were coerced into voting for conviction contrary to their belief that defendant was not guilty by reason of insanity? (5) Were oral and written statements given by defendant to law-enforcement officers properly admitted into evidence against him? (6) Was it error to place on defendant the burden of proof on the issue of insanity? (7) Was defendant's right against self-incrimination violated by the trial court's order that he submit to a psychiatric examination by state-selected doctors prior to trial pursuant to an agreement between defendant and the state? (8) Did defendant sustain his burden of proving that he was legally insane at the time he killed his wife and children?

■ Defendant contends upon this appeal that he was denied due process and a fair trial by the trial court's refusal to have his case tried to the court without a jury. This issue was recently considered by this court in Gaulke v. State, 289 Minn. 354, 184 N. W. 2d 599 (1971). In that case it was held that the right to waive a jury trial is statutory, not constitutional, and a claim that it was violated may be asserted on direct appeal but not by collateral attack in a postconviction hearing. Although relief was

denied Gaulke since the claim of right to waive a jury trial was asserted in a post-conviction hearing, this court undertook to resolve the question (289 Minn. 359, 184 N. W. 2d 602) of "whether Minn. Const. art. 1, § 4, and Minn. St. 631.01 grant a defendant in a criminal case the unconditional right to waive a jury." [1] We said:

"* * * Considering the historical antecedents of our constitution, it is doubtful that the legislature intended to grant the accused an absolute right of waiver. Although we perceive no intent that the waiver be subject to the consent of the prosecution, it has long been considered to be subject to the approval of the trial court." 289 Minn. 359, 184 N. W. 2d 602.

In short, the matter of whether a defendant may waive a jury trial was left to the sound discretion of the trial court.

In the instant case it appears from the record that no actual motion to waive a jury trial was ever made by defendant. Numerous references were made to prior discussions among counsel for both sides and the trial court with respect to the possibility of

---

[1] Minn. Const. art. 1, § 4, provides in relevant part: "The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy, but a jury trial may be waived by the parties in all cases in the manner prescribed by law * * *."

Minn. St. 631.01 provides: "An issue of fact arises upon a plea of not guilty, or upon a plea of former conviction or acquittal of the same offense. Except where defendant waives a jury trial, every issue of fact shall be tried by a jury of the county in which the indictment was found or information filed, unless the action shall have been removed by order of court as provided in sections 627.01 to 627.04. If the defendant shall waive a jury trial, such waiver shall be in writing signed by him in open court after he has been arraigned and has had opportunity to consult with counsel and shall be filed with the clerk. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial. If the charge against the accused be a misdemeanor, the trial may be had in the absence of the defendant, if he shall appear by counsel; but, if it be for a felony or gross misdemeanor, he shall be personally present."

such a motion, but only at the instance of one of the state's counsel was the question regarding a waiver of the jury ever presented to the trial court for an actual ruling. When asked by the court if he wished to request a waiver of the jury, defendant's counsel replied:

"At this time I could not, in conscience, request a waiver of the jury, because of the motion I have pending [on an affidavit of prejudice]."

The court then indicated that it would not foreclose defendant's right to move that the jury be waived, but that it might deny such a motion in defendant's best interests and welfare.

Voir dire commenced the same day, and the following day, before continuing with the selection process, defense counsel stated that he wished to clarify for the record that he had requested that the jury be waived and that his motion had been denied. The court mistakenly thought that this motion and its denial appeared of record but stated that it would allow this to appear of record again.

It seems clear to us that no motion was ever made by defendant. The record merely shows that counsel erroneously represented to the court that a motion that defendant be permitted to waive a jury previously had been made and the request denied. As stated in Gaulke v. State, *supra*, a defendant's right to waive a jury is a statutory right, and we must conclude that defendant never properly sought a waiver of a jury trial in compliance with the provisions of § 631.01.

■ Defendant next contends that the trial court erred in refusing to honor an affidavit of prejudice.

Minn. St. 542.16, which authorizes the substitution of judges by affidavit of prejudice, provides in relevant part:

"* * * In criminal actions such affidavit [of prejudice] shall be made and filed with such clerk [of court] by the defendant, or his attorney, not less than two days before the expiration of the time allowed him by law to prepare for trial * * *."

The Rasmussen hearing in the instant case was commenced on January 3, 1968, and was originally terminated on January 10, the trial date at that time being set for February 5. Upon defendant's motion, the Rasmussen hearing was reopened on February 13, and at the close of the reopened hearing on the following day, the court announced that it would convene for trial on February 19.

On the morning of the 19th, however, when the court announced that it would proceed with the trial, defendant moved that the Rasmussen hearing be reopened for a second time. Following discussion on this motion, it was denied by the court, and a discussion off the record followed in chambers. The court did not convene again until the following morning, February 20, at which time defendant filed an affidavit of prejudice, requesting a substitution of judges. The court held that the affidavit had not been filed within the time authorized by § 542.16.

Under § 542.16, the time allowed a defendant by law to prepare for trial means the period preceding the date set for trial. State v. Hoist, 111 Minn. 325, 126 N. W. 1090 (1910); State v. Betsinger, 287 Minn. 518, 176 N. W. 2d 623 (1970). Giving all allowances to defendant for delays, postponements, and necessary continuances of the trial from the original trial date of February 5, the date set for trial within the meaning of the statute was February 19. Therefore, the date set for trial at the time of the filing of the affidavit of prejudice had passed by at least one day and the trial court's refusal to give it automatic effect was not error.

After the trial court had ruled that the filing of the affidavit was untimely, counsel for the defense asked to be heard for the record, and a lengthy discourse followed. He discussed various adverse rulings made during the course of, and following, the Rasmussen hearings regarding inter alia, the admissibility of defendant's statements and publicity by the news media. The court then reiterated its denial of the motion, giving its reasons therefor, whereupon counsel for the defense stated to the court:

"If that is your ruling, I want Mr. Hoskins to know, for his own benefit, that I have absolutely the highest regard for your competence."

Counsel indicated that he was assured that the trial court had discharged "its duties in an absolutely ethical and moral way."

Therefore, given the untimeliness of the affidavit, the immediacy of the jury selection process, and the lack of a basis in fact or law for the affidavit, the trial court's refusal to honor it was not error.

■ Following conviction, defendant moved for a new trial based, inter alia, on affidavits received from three of the jurors. Two of the affidavits alleged that while the jurors were having dinner together during the period of their deliberations, a male bailiff at a table within hearing distance of the jurors made derogatory remarks to his wife and a female bailiff evincing feelings relative to defendant's guilt. One of these affidavits also alleged that during the trial one of the prosecuting attorneys stated to co-counsel within hearing of the jury: "You can't kill animals, only people." This allegedly occurred after defendant had testified that he could not carry on a job which required killing animals. Defendant argues that these statements made by the bailiff and the prosecutor were so prejudicial as to deny him a fair trial.

The state in rebuttal submitted affidavits of the male bailiff, the female bailiff, the jury foreman, and another member of the jury. These affidavits denied that a statement concerning defendant's innocence or guilt was ever made by the male bailiff at the time and place alleged in the two affidavits proffered by defendant.

In considering defendant's motion the trial court studied all of the affidavits and concluded that the evidence preponderated against the claims set out in the affidavits submitted by defendant and that defendant was not entitled to a new trial.

Defendant relies on Parker v. Gladden, 385 U. S. 363, 87 S. Ct. 468, 17 L. ed. 2d 420 (1966), as authority compelling a reversal

by this court based on the statements of the bailiff and the prosecutor. In that case, also involving a murder, a bailiff stated to a juror in the presence of others, "Oh that wicked fellow [petitioner], he is guilty." And to another juror he said, "If there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it." 385 U. S. 363, 87 S. Ct. 470, 17 L. ed. 2d 422. The United States Supreme Court held that such conduct violated the defendant's Sixth Amendment right to a trial by an impartial jury and to be confronted by the witnesses against him. In Parker, however, there was no dispute as to what the bailiff said, nor to whom it was said. In the instant case the bailiff categorically denied making any of the statements alleged in the affidavits at any time while in the presence of the jury. This was supported in the remainder of the state's affidavits, and therefore a question of fact arose. The trial court resolved the question against defendant.

In State v. Warren, 201 Minn. 369, 374, 276 N. W. 655, 658 (1937), another case involving the claim that the trial court erred in refusing to grant a new trial on the ground of misconduct of a bailiff in the presence of jurors, this court said:

"* * * It is settled that the granting of a new trial for misconduct of the jury rests almost wholly in the discretion of the trial court, especially when, as here, the motion is decided on conflicting affidavits, and its action will not be reversed on appeal except for a clear abuse of that discretion. * * * The same is true as to the alleged misconduct of the bailiff. This is necessarily so, because, due to the opportunity the trial judge has of observing the jurors and court officers and also events occurring during the trial, he is in a far better position to determine the facts when misconduct on the part of those persons is claimed."

We find no abuse of discretion on the part of the trial court in weighing the evidence of the alleged misconduct of the bailiff and in denying defendant's motion for a new trial on that ground.

With respect to the alleged misconduct of counsel for the state, it appears that this issue was not properly raised before the trial court. As has been stated many times, an appellate court cannot consider matters which were not properly raised and acted upon below. State v. Markuson, 261 Minn. 515, 519, 113 N. W. 2d 346, 349 (1962); 5B Dunnell, Dig. (3 ed.) § 2500.

 The three jurors' affidavits submitted by defendant also stated that during deliberation the jury summoned the bailiff to see if they could have access to the trial judge's instructions. The bailiff allegedly advised the jury that the judge and counsel would have to be summoned and the instructions reread to the jurors. As the jury foreman was writing a request for the judge, the bailiff allegedly told the jurors that the judge had been ill that day and would have to come to the courthouse from a sick bed. The foreman then allegedly tore up the request and announced that the jury would wait until the next day for a rereading of the instructions. Subsequently, no further request of this sort was ever made. Defendant contends that the bailiff's alleged statement that the judge was ill and his failure to notify the judge that the jury desired additional instructions served to sever the line of communication between the jury and the judge.

In the state's rebuttal affidavits, however, the male bailiff, the jury foreman, and the jury member stated that the bailiff's remarks concerning the health of the judge and the summoning of the attorneys were not made to discourage the jury from receiving clarification of the instructions but were made to explain that a slight delay would follow before the instructions would be reread.

In support of his contention, defendant relies on Stayberg v. Henderson, 277 Minn. 16, 151 N. W. 2d 290 (1967). In that case, a personal injury action in which defendants prevailed, plaintiffs moved for a new trial based upon an affidavit of one of the jurors that the bailiff had refused a request to summon the trial judge for a clarification of instructions. At the hearing on the motion, the bailiff testified that he had tried to contact the judge

but had been unsuccessful. Counsel for the plaintiffs asked the trial court to continue the hearing to enable him to bring in additional evidence as to whether the bailiff had ever attempted to reach the judge. The court denied the continuance, stating that it thought plaintiffs' motion had to be decided on what was before the court at that time. This court, citing Kavanaugh v. Quigley, 63 N. J. Super. 153, 164 A. 2d 179 (1960), remanded the case to the trial court for plaintiffs' evidence on the motion for a new trial to be fully heard.

In the instant case all of the evidence pertaining to the bailiff's alleged failure to summon the trial judge was presented at the hearing on defendant's motion for a new trial. The trial judge weighed all of the evidence, and the record reveals no request for a continuance to produce new evidence as in Stayberg v. Henderson, *supra*. In his memorandum accompanying the order denying defendant's motion for a new trial, the judge stated that, although he could not recall being ill at the time alleged, he felt upon examining all of the affidavits that the bailiff's statement was not made to dissuade the jury from calling him, but to indicate that it might take a little time to assemble the necessary parties for additional instructions. The judge concluded that this did not constitute misconduct. He further stated that he was in his chambers at 9:15 a. m. the next morning and that no indication was given at that time or later that further instructions were desired.

As was stated in State v. Warren, *supra,* the trial judge is vested with almost total discretion in determining whether acts of court officials constitute misconduct which denies a defendant a fair trial. This court will reverse only for an abuse of that discretion, and none is shown in the instant case. The issue presented to the court in Stayberg v. Henderson, *supra,* is not before us, as all of the evidence was fully heard on the motion below. We must conclude that, when the jury failed to seek further instructions the next day, it had resolved the questions and had therefore withdrawn its request for further instructions. Defi-

baugh v. Ulmer, 56 Ohio App. 255, 10 N. E. 2d 447 (1937). See, also, Stayberg v. Henderson, *supra*.

The final matter contained in the three jurors' affidavits submitted by defendant were allegations to the effect that (1) the jury initially was unable to agree upon a verdict and finally agreed only because of coercive actions by the foreman and another juror; (2) none of the affiants agreed with the jury's verdict of guilty for which they voted, but felt instead that defendant was not guilty by reason of insanity; and (3) the affiants would have impeached the verdict had they been polled after it was announced.

The record shows that upon the reading of the verdict in court all of the jurors nodded in approval and no objection was heard when the jury was asked if it was a true verdict. The court thereupon asked defense counsel if he desired to poll the jury, to which counsel replied in the negative. Not the slightest indication was given by any juror at that time that the verdict was not a true one or that his answer would have been different had the jury been polled.

This court, in common with most others, has consistently followed the rule that a jury's deliberations must remain inviolate and its verdict may not be reviewed or set aside on the basis of affidavits or testimony concerning that which transpired in the course of the jurors' deliberations. Weber v. Stokely-Van Camp, Inc. 274 Minn. 482, 144 N. W. 2d 540 (1966); 14 Dunnell, Dig. (3 ed.) § 7109. In short, jurors are not competent to disclose any matters which inhere in the verdict, such as their mental processes in connection with it or any other matter resting alone in their minds or consciences. Bauer v. Kummer, 244 Minn. 488, 70 N. W. 2d 273 (1955); Fortier v. Newman, 248 Minn. 69, 78 N. W. 2d 382 (1956); State v. Robinson, 262 Minn. 79, 114 N. W. 2d 737, certiorari denied, 371 U. S. 815, 83 S. Ct. 26, 9 L. ed. 2d 56 (1962); Gardner v. Germain, 264 Minn. 61, 117 N. W. 2d 759 (1962). See, also, Stayberg v. Henderson, *supra*.

An exception to the general rule against allowing jurors to

impeach their verdict exists where a juror's affidavit shows objective circumstances and overt acts amounting to coercion. See, State v. Gavle, 234 Minn. 186, 48 N. W. 2d 44 (1951). In discussing the "overt acts" exception, this court in Gavle stated (234 Minn. 209, 48 N. W. 2d 57):

"* * * That exception applies to cases where some of the jurors, by overt acts, have coerced other members of the jury. [Perry v. Bailey, 12 Kan. 539 (1874)] holds that affidavits showing such coercion may be used to impeach the verdict, because proof of the coercive overt acts does not lie exclusively in the consciousness of one juror."

The term "overt acts," as employed in this context, refers to "those matters lying outside the personal consciousness of the individual juror, those things which are matters of sight and hearing, and therefore [are] accessible to the testimony of others, and [are] subject to contradiction * * *." Perry v. Bailey, 12 Kan. 539, 544 (1874). It necessarily follows that such acts, to warrant impeachment of a verdict, must have coerced a verdict which would otherwise not have been brought.

Defendant contends that the three jurors' affidavits show overt, coercive acts on the part of the jury foreman which constitute grounds for impeachment of the verdict. We must disagree. We find little basis in the statements relating to the alleged acts of coercion of the jury foreman and another member of the jury. Only one of the affidavits goes into any detail in describing these acts. The other two affidavits relate only that the foreman stated his belief that the jury had a duty to reach a verdict; they offer no instances of coercion or intimidation by anyone. The state's rebuttal affidavits deny the allegations of the first affidavit and allege that all members of the jury freely and openly took part in the deliberations.

It is well recognized that in any jury of 12 persons a few, by dint of personality, experience, or knowledge, will predominate. However, unless the predominance is obtained by "overt actions" which are coercive in nature and effect and are within the con-

sciousness of all jurors, postverdict impeachment by a juror is not allowed. State v. Gavle, *supra.*

With respect to the jurors' claims of disagreement with the verdict and their intention to denounce it when polled, these are clearly matters which inhere in the verdict and are insufficient to impeach it. See, Bauer v. Kummer, *supra;* Annotation, 40 A. L. R. 2d 1119.

■ Defendant's next argument involves alleged violation of the substantive and procedural safeguards afforded him by Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. ed. 2d 694 (1966). He claims that these rights were violated by the admission into evidence of an exculpatory statement given at 11 a. m. of the morning following the tragedy, prior to his being informed of these rights.

At the time of this initial interview, defendant contends, he was in custody as a suspect in the slayings of his family and therefore should have been advised of his constitutional rights to remain silent and to have an attorney. He bases this contention on statements the Stearns County sheriff had made to the press and others prior to talking to defendant in which the sheriff said he did not believe defendant's initial version of the tragedy. Defendant also alludes to the fact that a deputy sheriff was posted outside his hospital room from the time he was admitted until he was transferred to jail a few days later and claims that he was held incommunicado from friends and members of his family who desired to see him.

We believe the disposition of this issue to be controlled by our holding in State v. Mitchell, 282 Minn. 113, 163 N. W. 2d 310 (1968). In that case this court affirmed a manslaughter conviction, holding that police questioning of the defendant, the victim's husband, at a hospital where he had been taken for medical observation, did not constitute custodial interrogation requiring a Miranda warning. We determined there that the defendant had not been under arrest and that he had not been restrained by the police although their investigation at the time of the questioning

had revealed that the wife's death was a homicide; that the fire at the defendant's house where the body was discovered resulted from arson in which gasoline had been used; that the defendant was probably the only person, aside from his wife and small daughter, in the house at the start of the fire; and that defendant's shoes, left at a neighbor's shortly after the fire had started, had a strong gasoline odor. We said there (282 Minn. 120, 163 N. W. 2d 315):

"* * * The preliminary inquiry made at the hospital was an essential part of the investigative process. With the limited knowledge which they possessed before talking to Dr. Mitchell, any assertion on their part indicating to him that he was a prime suspect would have been rash or, at least, imprudent. * * * He was not under arrest. Although he was hospitalized, his freedom had not been restrained by the officers in any way. He was merely responding to the routine inquiry that police officers must make and which a husband would ordinarily insist that they should make upon discovering his wife burned, beaten, and lifeless in the family domicile. * * *

"Our conclusion that this testimony was properly received is adequately supported by the available case authority. To hold otherwise would be to condemn and curtail noncustodial inquiry by police officers from the persons most interested and best able to help in solving crimes."

In the case at bar, defendant was the only survivor of the fire which destroyed his home and took the lives of his family. At the 11 a. m. interview, defendant's pastor, the Stearns County sheriff, and a State Crime Bureau investigator entered his hospital room in order to inform him that all of his family had perished in the fire and to speak with him for the first time concerning the events of the tragedy. Defendant was asked only to give his account of what had occurred. He repeated his story of being attacked and shot by four people and being tied up while his buildings were burned. He was questioned no further after giving this account. No pressure was exerted upon defendant which would

tend to place him in "the compelling atmosphere of the in-custody interrogation" spoken of in Miranda. 384 U. S. 465, 86 S. Ct. 1623, 16 L. ed. 2d 718. Although the sheriff had felt that the hearsay reports of defendant's story were fantastic, he had not heard defendant's account firsthand and was pursuing routine investigative procedure in eliciting it. He clearly had not focused his investigation upon defendant. State v. Kinn, 288 Minn. 31, 178 N. W. 2d 888 (1970).

With respect to defendant's allegation that he was in custody and was held incommunicado because of the presence of a deputy sheriff outside his hospital room and because visitors were not allowed to see him, we think these actions to be reasonable precautionary measures under the circumstances of the case. Defendant was wounded and, therefore, logically was confined to the hospital. According to his exculpatory statement, the four individuals who allegedly had attacked him and killed his family were unknown and were presumed to be still at large. The posting of the guard outside his door to protect him from further harm would only seem logical in light of his story. Keeping visitors away would be another precaution which good medical judgment would demand. However, members of his family and a minister were allowed to see him later on during his confinement in the hospital.

Taking into consideration all of the circumstances of the initial interview—the purpose for which it was conducted, the way in which it was handled, and the atmosphere of the location—the introduction into evidence of defendant's oral exculpatory statement did not violate his rights under the principles set forth in Miranda v. Arizona, *supra*. State v. Mitchell, *supra;* Lamb v. United States, 414 F. 2d 250 (9 Cir. 1969); People v. Phinney, 22 N. Y. 2d 288, 292 N. Y. S. 2d 632, 239 N. E. 2d 515 (1968); Commonwealth v. Frye, 433 Pa. 473, 252 A. 2d 580 (1969); People v. Gilbert, 8 Mich. App. 393, 154 N. W. 2d 800 (1967) ; State v. Webb, 81 N. Mex. 508, 469 P. 2d 153 (1970).

A few hours after defendant had been brought to the hospi-

tal, he was given an injection of 50 milligrams of the drug Librium, a tranquilizer. The effects of the drug gradually build up in the system, reaching peak effectiveness about 8 hours after administration and slowly tapering off thereafter. Some 17 hours after receiving this injection, defendant was interviewed for the second time by law-enforcement authorities. At that time he gave a second oral exculpatory statement similar to his first one, and he also answered a few direct questions propounded by the officers. The questions related to whether defendant and his wife had ever had any marital problems and whether he had ever had any extramarital involvements, to which defendant replied in the negative. Defendant was then advised for the first time that he had a right to remain silent, that anything he said could be used against him, that he had a right to have an attorney present, and that an attorney would be provided for him if he could not afford one. Defendant replied that he understood these rights. The trial court held that the second exculpatory statement was inadmissible since sufficient suspicion had focused on defendant at the time it was given to require Miranda warnings prior to the commencement of the interview.

After giving the Miranda warnings, the investigator told defendant that "there are holes in your story" since things at the scene of the crime did not "check out" with what defendant had told them and since it had been discovered that defendant had a girl friend. At this point, a second investigator came into the hospital room. This agent again advised defendant of his rights, but defendant interrupted him and said that he knew of his rights. Defendant waived his rights and shortly thereafter gave a coherent, written inculpatory statement relating to the facts surrounding the tragedy. The next afternoon defendant was once again advised of his rights and another written statement was taken. Both written confessions were admitted into evidence.

Defendant alleges error in admitting these confessions into evidence. He contends (1) that the waiver of his constitutional rights was not freely, intelligently, and voluntarily made due to

the fact that he was under the influence of Librium and was wounded at the time of the confessions; and (2) that the inadmissible oral, exculpatory statement prejudicially tainted the subsequent written confessions, making them illegal.

With respect to defendant's first claim, the trial court found that defendant's judgment was not impaired by any tranquilizer at the time he gave his inculpatory statements. The court noted in its memorandum that defendant's medical expert testified about the pharmacological effects of Librium on a person but, although he felt defendant's judgment would have been impaired at the time the inculpatory statements were given, he could not make a definite determination as to the extent of the impairment. Conversely, the state's expert testified that from a clinical standpoint Librium would have no effect on defendant's judgment or ability to think clearly. In fact, the state's expert testified that since the Librium was administered primarily to ease tension and anxiety, its effect would be to improve defendant's thinking process. The court concluded that defendant was mentally competent when he waived his rights and that the drug had no effect on his decision-making process or judgment.

The determination of defendant's competency to waive his constitutional rights is a function of the trial court. Johnson v. Zerbst, 304 U. S. 458, 58 S. Ct. 1019, 82 L. ed. 1461 (1938) ; State v. Keiser, 274 Minn. 265, 143 N. W. 2d 75 (1966). The issue before the trial court was whether defendant's abilities to reason, comprehend, or resist were in fact so disabled that he was incapable of making a free or rational choice. We have said that to determine this issue the trial court must look to the particular facts of the case and the whole situation and surroundings of the accused, including all that occurred immediately prior to and at the time of the confession. State v. Keiser, *supra*.

In Jankord v. State, 290 Minn. 168, 186 N. W. 2d 530 (1971), an appeal from a postconviction proceeding to set aside a first-degree manslaughter conviction, we affirmed the trial court's determination relative to this issue. In that case the defendant

was intoxicated at the time he admitted to a detective that he had shot his wife, but the trial court found that he was not so intoxicated as to render himself incompetent to make a voluntary and intelligent waiver of his constitutional rights. With respect to defendant's claimed incompetence to make such a waiver, we think the record in the instant case is even less persuasive than that in Jankord. Defendant was thoroughly apprised of his rights; he acknowledged understanding them; and his only request was that his pastor be summoned, which the authorities attempted to do without success. We are of the opinion that the state carried its burden of establishing a voluntary waiver by defendant of his rights. State v. Keiser, *supra*. His medical evidence on the effect of Librium on him at the time of the confessions was contradicted by the state. The evidence in this record amply sustains the finding of the trial court that defendant was not suffering sufficient impairment of judgment to alter his ability to voluntarily waive his rights.

As to defendant's allegation that the inadmissible exculpatory statement prejudicially tainted the subsequent written confessions, we find no basis for this claim in the record. Before giving both written confessions, defendant was clearly and properly informed of his rights under Miranda v. Arizona, *supra*. He gave no information prior to these warnings which would cast suspicion upon him nor add to his exculpatory statements. It is clear that outside investigation, and not his own admissions, was the factor which led the authorities to warn him of his rights and to conduct the subsequent interrogations which elicited his confessions.

In State ex rel. Pittman v. Tahash, 284 Minn. 365, 170 N. W. 2d 445 (1969), this court held that a full oral confession, inadmissible because obtained without proper warnings, did not prejudicially taint a written confession obtained later in the day after proper warnings were given. Here we have much less, because at no time up until he was warned, was interrogated, and subsequent-

ly confessed, did defendant implicate himself in the commission of the crimes.

■ Another question raised is whether defendant was denied due process when he was required to carry the burden of proof on the issue of his alleged insanity. At trial defendant raised the defense of insanity, and virtually all the evidence he submitted was on this issue. He now argues that to require him to carry the burden of proving his insanity at the time of the crime was a denial of due process. He reasons that (1) the state was relieved of proving beyond a reasonable doubt one of the essential elements of the crime—his sanity, and (2) requiring him to prove his insanity violated his Fifth Amendment right against self-incrimination.

The relevant statutes relating to presumption of sanity and the burden of persuasion and quantum of proof on the issue of insanity are the following: Minn. St. 611.025, which provides:

"Except as otherwise provided by law, in every criminal proceeding, a person is presumed to be responsible for his acts and the burden of rebutting such presumption is upon him."

Minn. St. 1969, § 611.026, which provides:

"No person shall be tried, sentenced, or punished for any crime while in a state of idiocy, imbecility, lunacy, or insanity, so as to be incapable of understanding the proceedings or making a defense; but he shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act he was laboring under such a defect of reason, from one of these causes, as not to know the nature of his act, or that it was wrong." [2]

From a statutory standpoint, the intent of the legislature to substantively establish the M'Naghten rule and to impose upon the defendant the burden of persuasion is clear. Both legislative provisions are well recognized in decisions of this court, and if any change in either is deemed necessary or desirable, resort must be

---

[2] The amendment to Minn. St. 1969, § 611.026, by L. 1971, c. 352, § 1, does not affect the decision herein.

had to the legislature and not to the courts. State v. Dhaemers, 276 Minn. 332, 150 N. W. 2d 61 (1967); State v. Finn, 257 Minn. 138, 100 N. W. 2d 508 (1960). It is settled that this placement on a defendant of the burden of persuasion relative to insanity does not offend any constitution provision. Leland v. Oregon, 343 U. S. 790, 72 S. Ct. 1002, 96 L. ed. 1302 (1952).

■ Prior to trial the court was requested to render an advisory opinion as to whether or not it would honor the state's request to have defendant examined by a state-appointed psychiatrist or psychologist if defendant should call his own psychiatrist or psychologist to establish that he was insane at the time of the crime. In answer to this, the trial court informed the parties that it would be disposed to grant such a request. Defense counsel then announced the agreement of the parties that in order to avoid disruption of the trial defendant would submit to such an examination before trial rather than during trial. It was stipulated between the parties that "his submission to any such examination is done pursuant to this agreement and not on a voluntary basis of waiving his rights to medical privilege or his right against self-incrimination." The state further stipulated that statements made to a state-appointed psychiatrist would not be used in its case in chief, but only as rebuttal to psychiatric testimony offered by defendant.

Thereafter, an examination was made by two state-appointed doctors. At its conclusion, both doctors agreed with defense experts that under prevailing legal standards defendant was insane at the time of the crime. The state thereupon retained another physician and had him attend the trial to observe defendant and to be available to testify in rebuttal to evidence of defendant's claimed insanity. It was subsequently agreed, however, that the state would forego calling the doctor who had observed defendant at trial if defendant would not call the state-appointed physicians who concurred in the opinion of defendant's own experts. At the time of this latter agreement, defendant knew what the testimony of the state-appointed experts would be, and he was at liberty to

call them as his own witnesses. Since Dr. Carl Malmquist and Dr. Paul Meehl, defendant's own experts, had already testified at length concerning his insanity, it would appear that a tactical decision was made by defendant to leave the testimony of his two medical experts uncontroverted by another expert before the jury and that he therefore agreed not to call the two state-appointed medical witnesses favorable to him on the condition that the state would not call its additional medical witness. As a result, the testimony of the two medical witnesses for defendant was the only evidence which could be regarded as expert testimony on the issue of defendant's insanity at the time of the commission of the crime.

Defendant now cites as error the trial court's "order" requiring him to submit to an adverse mental examination. He argues that in State v. Olson, 274 Minn. 225, 143 N. W. 2d 69 (1966), this court held that the trial court had no authority to order such an examination, and he further claims that the trial court's order failed to provide a safeguard against violation of defendant's privilege against self-incrimination. Viewed in light of the record, we think neither of these claims constitutes reversible error. We said in Olson (274 Minn. 233, 143 N. W. 2d 75):

"* * * [S]ince there are no statutes in this state governing the procedure in cases where the accused pleads insanity as a defense and providing the necessary machinery and guidelines for the protection of the accused from self-incrimination, the courts have no legal basis, without the defendant's consent, for ordering an examination either to determine his mental condition at the time of the alleged criminal acts or to qualify an expert psychiatric witness by virtue of such examination to testify at trial."

The record shows that no order was ever issued by the trial court compelling defendant to submit to an adverse mental examination. Instead, an advisory opinion was requested on a hypothetical state of facts submitted to the trial judge. The trial judge responded by saying that under the facts stated he would "order" an adverse mental examination of defendant. Whether this was

error, we need not decide. All parties were familiar with the holding in State v. Olson, *supra,* and after receiving the trial court's opinion, defense counsel did not challenge its propriety. He instead agreed to allow defendant to be examined prior to trial in order to "be helpful in arranging for a smooth trial." Defense counsel thus consented to an adverse mental examination, although reserving objections he might have to violations of defendant's right against self-incrimination and his medical privilege.

The keys to valid pretrial, state-conducted psychiatric examinations are the consent of the defendant and the care that Fifth Amendment rights are protected. This court recognized in State v. Olson, *supra,* that once the sanity of a defendant is put in issue, the state is entitled to obtain rebuttal information. We also indicated the procedure for obtaining such information absent statutory guidelines:

"* * * Should a defense be in fact presented, the state in rebuttal will be able to present its own evidence as to his mental condition. Naturally it will have to conduct its own psychiatric examination of relator in order to present such evidence. Thus if the examination is conducted at some point after the trial has begun, there might have to be a recess and a disjointed trial could result." 274 Minn. 227, 143 N. W. 2d 72.

The record in the case at bar does not reflect any statement by the trial court that it would not allow defendant to interpose the defense of insanity unless he agreed to undergo a pretrial psychiatric examination by state-appointed doctors. The court did indicate, however, that it would allow a recess for an examination pursuant to the Olson procedure. Defendant's agreement to the pretrial examination eliminated the need for a recess. It in no way prejudiced defendant. In fact, as a consequence of the agreement not to call the state-appointed doctors, the jury was never advised that defendant had been examined by any medical experts other than Drs. Malmquist and Meehl. Furthermore, not one fact resulted from the examination of defendant by state experts which

defendant can claim assisted the prosecution in establishing its case in any way.

Defendant was not placed in a position where he had to choose between exercising his Fifth Amendment rights and fully presenting his insanity defense. He knew of the state's experts' conclusions, and he was free to call them.

■ Finally, defendant contends that he should have had a directed verdict on the issue of insanity. He argues that the only expert medical testimony admitted at the trial was to the effect that he was insane at the time of the commission of the crimes.

The trial court, however, reached the conclusion that it should be left to the jury to determine whether defendant did or did not sustain his proper burden of establishing that he was legally insane at the time he killed his wife and children. In other words, whether a person charged with a crime was legally insane at the time of the act involves a fact question. Only the two doctors called by defendant testified as experts that defendant was legally insane on the day of the homicides. No other testimony was offered from either side concerning the question of sanity. In any process of determination, however, the jury is not bound to accept the testimony of any witnesses as credible, and in evaluating the testimony of experts, the same standards should be applied as are used to gauge the credibility of lay witnesses. State v. McCabe, 251 Minn. 212, 87 N. W. 2d 360 (1957).

Defendant's experts were subjected to extensive cross-examination on the subject of his sanity. Furthermore, the circumstances surrounding the shooting bespoke intent, and the arson connected with it would support a conclusion that the crime was the product of a "depraved mind." Lastly, it is noted that defendant had as a possible motive for the crime his illicit love affair. It cannot be said, therefore, that defendant irrefutably established that he did not know right from wrong at the time of the crime.

The jury is the sole judge of whether a witness is to be believed and of the weight to be given to his testimony. Therefore, it would be erroneous to conclude that the mere introduction of unrebutted

expert testimony as to defendant's insanity necessarily satisfies his burden of proof. United States v. Spaulding, 293 U. S. 498, 55 S. Ct. 273, 79 L. ed. 617 (1935); McDonald v. United States, 114 App. D. C. 120, 312 F. 2d 847 (1962). See, also, Meemken v. O'Hara, 243 Minn. 138, 66 N. W. 2d 601 (1954); Carpenter v. Birkholm, 242 Minn. 379, 65 N. W. 2d 250 (1954). It clearly appears that the jury, in determining the weight and sufficiency of the expert testimony, applied the same tests as those used in evaluating other testimony. State v. McCabe, *supra;* State v. Gorman, 219 Minn. 162, 17 N. W. 2d 42 (1944).

We have been cited no authorities which hold that the absence of countervailing expert testimony necessarily compels acceptance of the opinion evidence of defendant's experts as conclusive on the insanity issue. Nor does such evidence entitle defendant to a directed verdict of not guilty. See, State v. Quilling, 363 Mo. 1016, 256 S. W. 2d 751 (1953). The rules governing opinion and expert testimony are the same in criminal cases as in civil. The settled doctrine is that testimony of experts is to be considered like any other testimony. It is to be tried by the same tests and is entitled to just so much weight and credit as the jury may attribute to it in light of the circumstances surrounding it.

Recently, in State v. Thompson, 273 Minn. 1, 36, 139 N. W. 2d 490, 515, certiorari denied, 385 U. S. 817, 87 S. Ct. 39, 17 L. ed. 2d 56 (1966), this court reiterated its position regarding the scope of review in determining the sufficiency of the evidence and the authority of the jury in regard thereto. We conclude that, under the sound rule of the Thompson case, the record here reflects more than sufficient evidence to sustain the verdicts returned by the jury. Any directed verdict that defendant was not guilty by reason of insanity would have been improper, as the sanity issue was for the jury to decide. United States v. Spaulding, *supra;* McDonald v. United States, *supra.*

Affirmed.