**STATE of Minnesota, Respondent,**

v.

**Ryan Michael PEDERSON, Appellant.**

**No. C0–99–450.**

Supreme Court of Minnesota.

July 20, 2000.

Deborah K. Ellis, St. Paul, for appellant.

Michael A. Hatch, St. Paul, Robert M. A. Johnson, Marcy S. Crain, Anoka, for respondent.

## OPINION

BLATZ, Chief Justice.

This case comes to us on direct appeal of appellant Ryan Michael Pederson's convictions for first-degree murder committed in the course of a burglary and second-degree murder. Appellant appeals his convictions on two grounds. First he claims that a juror's responses to a post-trial jury questionnaire demonstrate that she did not accord him the presumption of innocence and that she lied during voir dire when she stated that she would uphold the law. Second, appellant argues that the evidence was insufficient to sustain his convictions. In particular, he contends that uncorroborated accomplice testimony provided the only evidence of an entry for the purpose of committing a burglary, and the only evidence that appellant participated in the murder. Because we hold that the juror's post-trial statements are inadmissible under Minn. R. Evid. 606(b), and the accomplice testimony was corroborated by other witness testimony and the physical evidence, we affirm appellant's convictions.

Robert Anderson, a 32–year–old man, was found dead by his best friend on the evening of August 20, 1997, after the friend made numerous attempts to contact him that day. Officers called to the scene found Anderson lying face down on the floor of his mobile home in a pool of blood, partially covered by a blanket. His injuries were consistent with being repeatedly beaten with a blunt object, kicked, stomped, and stabbed. He had no defensive wounds, a blood alcohol level of .18, and tested positive for recent marijuana use.

Anderson's poodle, found guarding the body, had a bruised abdomen. Also near the body were the broken pieces of a long-barreled rifle, blood spatter, the handle of a steak knife, and two sets of bloody shoe prints. One of the prints, which had an athletic tread design consisting of a uniformly spaced and linear dot pattern, was similar to a print found by the medical

examiner on the victim's back. Blood from the victim was found on the sofa, under the counter, on the walls, and on the ceiling. The mobile home was in disarray, but that was characteristic of the way the victim lived. No identifiable fingerprints were found in the home.

Six days later, the police responded to a report that someone was breaking into Anderson's mobile home, which was still posted as a crime scene. The arriving officer observed a man carrying a chair between Anderson's home and a mobile home next door owned by Stephen Dean. The officer pursued the man into Dean's mobile home where he found appellant, Dean, Anthony Moses, and three others who admitted they had been peeking into Anderson's mobile home. Everyone was arrested and taken to the station where the officer noticed that both appellant and Dean were wearing new tennis shoes.

As a result of these arrests, the police obtained statements from Moses and Dean implicating Dean and appellant in the murder. Investigators also searched Dean's home and conducted luminol testing for the presence of trace blood. Two of the four sites that tested positive for blood had a dot-pattern shoe print consistent with that observed at the crime scene.

On May 14, 1998, a grand jury indicted appellant and Dean on three counts of murder in the first degree and aiding and abetting murder in the first degree. Subsequently, Dean entered into a plea agreement with the state. Dean agreed to testify at appellant's trial and in return, Dean was allowed to plead guilty to burglary in the first degree and to aiding and abetting intentional second-degree murder for his role in Anderson's murder.[1]

At appellant's trial, the testimony established the following facts. On August 19, 1997, appellant, who was 17 years old, attended a party at Dean's mobile home to celebrate Moses' 18th birthday. The party came to an end, and with the departure of Moses, only Dean, appellant, and another friend, Joe Brown, remained. Appellant and Dean wanted to smoke marijuana, so the three men went next door to see if Dean's neighbor, Anderson, had some. Anderson recognized Dean and admitted them. Anderson brought out some marijuana, and they sat in the living room talking, drinking, and smoking.

Dean testified that after some time, he, appellant, and Brown all left Anderson's together. Brown went to his car and left; Dean and appellant returned to Dean's mobile home and watched television. Dean told appellant that he wished he had a bigger television and commented how easy it would be to steal Anderson's television. These musings eventually became a plan by Dean and appellant to steal Anderson's television, video cassette recorder (VCR), and other valuables. Dean testified that they also discussed they might have to knock Anderson out or even kill him. Prior to leaving Dean's mobile home at about 2:30 a.m., Dean placed socks over his hands and appellant wrapped a white T-shirt around his hands to avoid leaving fingerprints at Anderson's home.

According to Dean, he and appellant entered Anderson's home without knocking. Startled, Anderson got up from the couch. Appellant asked Anderson for some pop, and when he turned to get it, appellant swung a bottle at his head. The bottle slipped from appellant's hand and hit the wall, causing Anderson to turn and look at appellant. Appellant told Anderson that the bottle slipped, but Anderson did not believe him and looked scared. Anderson told them to take the pop and leave as he returned to the couch.

Dean testified that instead of leaving, he and appellant crowded next to Anderson on the couch and appellant began elbowing

---

**1.** Dean received a 12 1/2-year sentence for the murder and a 12 1/2-year stayed sentence for the burglary, to be served consecutively.

Anderson. Appellant eventually pushed Anderson to the ground and wrestled him until he had pinned Anderson face down on the floor, with his knee in Anderson's back. Appellant then punched and kicked Anderson in the head until he was unconscious, whereupon appellant and Dean began searching the home for items to steal.

While Dean searched the back bedroom, Anderson regained consciousness. Appellant began kicking Anderson in the ribs and face. When Dean returned to the living room, appellant asked Dean to help him so Dean held Anderson's legs while appellant stomped on Anderson's head. Anderson became unconscious again, and Dean and appellant decided they had to kill him or they "would both be told on." Using a rifle found by Dean, appellant hit Anderson in the stomach, ribs, and head, causing blood to spatter appellant's clothes and forehead. Sickened by the site of the blood, Dean vomited. Dean heard Anderson's dog yelp, and as he turned to see what happened, he saw the dog hit the wall.

At appellant's instruction, Dean continued searching the mobile home for goods to steal and found $400 between two books in a closet. Appellant walked around and touched various things, and Dean followed, wiping items off with the socks on his hands. Then, to make sure Anderson was dead, appellant stabbed him with a knife found in the mobile home. Dean grabbed the TV, VCR, and a video game, and took the items to his place. Upon returning to Anderson's, Dean saw appellant stab Anderson in the throat; appellant later showed Dean the handle of a knife and told him the knife had broken while he was stabbing Anderson.

Dean and appellant left Anderson's mobile home between five and six in the morning and returned to Dean's mobile home, both in shock. Appellant washed the blood off his face and hands, and changed out of his blood-spattered clothes while Dean paged Moses. They put appellant's clothes, the white T-shirt and socks

they wore on their hands, Dean's socks, and their shoes in a garbage bag. Moses called Dean's phone number in response to the pages he had received, and Dean answered. Moses testified that Dean told him in a hurried and frightened voice that they had killed Anderson and needed Moses to help them get rid of some stolen items. During the phone conversation with Dean, Moses heard appellant in the background saying, "Get me some clothes, Steve," in a loud and hurried voice. Dean ended the phone call by saying he needed to get out of his clothes, and hung up. In disbelief as to what he had heard, Moses called back and this time appellant answered the phone. Moses asked him "Did you guys really do it?" and appellant responded "Yeah, the neighbor is dead." They talked a little longer, and then appellant said "I got to get out of these clothes," and hung up.

After talking with Moses, appellant and Dean put the bag of clothes in Dean's car, and went out for breakfast. After making some other stops, they went to a mall where they each purchased a new pair of shoes with the money stolen from Anderson. Upon returning to Dean's mobile home, they found Moses and another friend, Alexander Lundeen, waiting for them. Moses asked Dean and appellant if they really did it, and Dean told him to look at the bag in the back seat, which appeared to Moses to contain clothes. Lundeen testified that Dean excitedly described how he "whacked" Anderson, and made motions with his hands and kicked his feet as he described the beating. Lundeen testified that while Dean explained what happened, appellant did not confirm or deny the characterization. Instead, appellant just put his head down and occasionally made affirmative sounds. Moses offered to dispose of the bag containing the clothes and asked appellant if he could have appellant's discarded black tennis shoes.

Moses and Lundeen left and drove to a nearby lake where Moses, according to his

testimony, opened the bag and saw a blood-spattered white T-shirt and two pairs of pants, as well as two pairs of shoes—he recognized one pair as belonging to Dean and the other as belonging to appellant. Moses took appellant's shoes from the bag and tried them on, but when they did not fit he returned them to the bag and discarded the bag with its contents in a dumpster. Moses described appellant's old shoes as having a dotted tread pattern.

Appellant's testimony at trial describing the circumstances of the murder differed considerably from Dean's. Contrary to Dean's testimony, appellant stated that when Brown left, Dean and appellant remained at Anderson's. At some point, Dean and Anderson began arguing about the former residents of Dean's mobile home—Dean's brother and friends. The argument escalated, and Dean pushed Anderson. Anderson told Dean to get out, and followed his dog, which had been kicked by Dean, to the back of the mobile home.

Anderson returned with a rifle, and again told Dean to get out. Dean grabbed the gun, wrestled Anderson into a headlock, and punched him in the face as Anderson struggled to get away. The two fell to the floor and Dean repeatedly kicked Anderson. Appellant tried to get Dean's attention by saying "Let's go" and hitting the wall, but Dean continued to kick Anderson. Dean picked up the rifle from the floor and struck Anderson multiple times with it.

Scared and hyperventilating, appellant ran outside and into a shed. After some time, he returned to Dean's mobile home where he found Dean on the phone with a VCR next to him. Appellant confronted Dean and learned that Dean had killed Anderson. Appellant testified that he wanted to go home, but did not have a ride at that hour of the morning. Dean eventually agreed to take him home, but instead they stopped for breakfast, went to Dean's father's house and Dean's brother's work-place, and then finally drove to a mall where Dean bought them both new shoes. Instead of taking appellant home at that time, they returned to Dean's home and found Moses and Lundeen waiting for them.

Appellant testified that he never planned to rob Anderson, and did not take anything from Anderson's home. He claimed that he did not cover his hands to conceal fingerprints and that he did not change his clothes or shoes at Dean's home. He testified that he never stabbed Anderson and denied taking any part in the murder.

Moses, who considered both appellant and Dean to be his best friends, testified that he spoke with both Moses and Dean, individually, about the murder. The day after the murder, while he and Dean were alone, Dean told Moses that he and appellant smoked marijuana with Anderson and then left. Then Dean and appellant discussed stealing Anderson's television and considered the possibility that they might have to kill Anderson in the process. Moses also testified that Dean told him that Dean and appellant went back to Anderson's home with their hands covered; appellant attempted to hit Anderson with a bottle and missed; appellant started elbowing Anderson, which led to kicking and beating; Dean searched the house for items to steal; appellant beat Anderson with a gun they found in the mobile home; appellant stabbed Anderson three times with a knife handed to him by Dean; and they stole $400, a TV, a VCR, a video game, and a stereo.

Moses testified that he also spoke with appellant alone on the following day, August 22. When Moses asked appellant what happened, appellant told him the same story as Dean had with two exceptions. Appellant told Moses that Dean kicked Anderson too, and appellant did not mention the stabbing of Anderson.

Following the testimony, closing arguments, and instructions by the court, the

jury retired to deliberate. On November 20, 1998, after a day and a half of deliberations, the jury returned verdicts of not guilty of premeditated murder and murder in the first degree while committing aggravated robbery, but guilty of murder in the first degree while committing burglary and murder in the second degree.

Following the verdicts, the county attorney's office sent questionnaires to the jurors seeking their input on the trial. On December 1, 1998, appellant's defense attorney received a typed, unsigned response to the questionnaire in an envelope with the last name and return address of juror K.T. Among the juror's comments on the questionnaire was the following statement: "I wanted more from [the defense counsel] in presenting the defense. I know a person is supposed to be innocent until proven guilty, but in reality it didn't work that way." The juror also stated that she did not believe the testimony of Dean or Moses, that she believed appellant and wanted him to be not guilty, and that she did not see him as a threat to society.

Upon receiving the questionnaire responses, appellant moved for a judgment of acquittal on the grounds that the verdicts were not sustained by the evidence, or in the alternative, a new trial or *Schwartz* hearing because of juror misconduct. The trial court denied the motion and sentenced appellant to life imprisonment for the conviction of murder in the first degree. On this direct appeal, appellant seeks review of the trial court's denial of a *Schwartz* hearing and also claims that the evidence was insufficient to support the verdicts.

## I.

■ We first address appellant's claim that he is entitled to a *Schwartz* hearing because of juror misconduct. When a defendant suspects a guilty verdict was tainted by juror misconduct, the defendant can make a post-trial motion to the trial court for a *Schwartz* hearing. *See* Minn. R.Crim. P. 26.03, subd. 19(6);

*Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 328, 104 N.W.2d 301, 303 (1960). A defendant must establish a prima facie case of jury misconduct before a motion for a *Schwartz* hearing must be granted. *See State v. Larson*, 281 N.W.2d 481, 484 (Minn.1979). "To establish a prima facie case, a defendant must submit sufficient evidence which, standing alone and unchallenged, would warrant the conclusion of jury misconduct." *Id.* We review the denial of a *Schwartz* hearing for an abuse of discretion. *See State v. Church*, 577 N.W.2d 715, 721 (Minn.1998).

■ In support of his request for a *Schwartz* hearing, appellant presented the trial court with the unsigned, typed responses to the county attorney's post-trial juror questionnaire that appellant's attorney received in the mail, apparently from juror K.T. Appellant contends that the juror's written comments establish that his state and federal constitutional rights to due process and a fair trial were violated. Specifically, he argues that the juror lied during voir dire when she said she would uphold the law as instructed by the judge and would presume that the defendant is innocent until proven guilty.

The usefulness of a juror's statement regarding a verdict is limited by Minn. R. Evid. 606(b), which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention, or whether any outside influence was improperly brought to bear upon any juror, or as to any threats of violence or

violent acts brought to bear on jurors, from whatever source, to reach a verdict. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

*See also State v. Hoskins,* 292 Minn. 111, 125, 193 N.W.2d 802, 812 (1972) ("jurors are not competent to disclose any matters which inhere in the verdict, such as their mental processes in connection with it or any other matter resting alone in their minds or consciences"); *Mattox v. United States,* 146 U.S. 140, 148–49, 13 S.Ct. 50, 36 L.Ed. 917 (1892). "This court, in common with most others, has consistently followed the rule that a jury's deliberations must remain inviolate and its verdict may not be reviewed or set aside on the basis of affidavits or testimony concerning that which transpired in the course of the jurors' deliberations." *Hoskins,* 292 Minn. at 125, 193 N.W.2d at 812.

The rationale for the exclusion of juror testimony about a verdict or the deliberation process is to protect juror deliberations and thought processes from governmental and public scrutiny and to ensure the finality and certainty of verdicts. *See* 27 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6072, at 403 (1990); Minn. R. Evid. 606; Advisory Comm. Cmt–1989. In *Schwartz,* we also expressed a concern that jurors be protected from harassment by counsel after the verdict. 258 Minn. at 328, 104 N.W.2d at 303.

Within this framework, we do not lose sight of the need to ensure fairness and accuracy in verdicts. We are concerned with discovering whether extraneous prejudicial information was considered by the jury, whether an outside influence was brought to bear on a juror, or whether threats of violence—either from outside the jury or among the jury members themselves—affected the verdict. *See* Minn. R. Evid. 606(b). We have also recognized an exception to the prohibition against juror testimony when a juror conceals a prejudice or bias on voir dire that would have disqualified the juror from service. *See State by Lord v. Hayden Miller Co.,* 263 Minn. 29, 35, 116 N.W.2d 535, 539 (1962); *see also State v. Callender,* 297 N.W.2d 744, 746 (Minn.1980) (recognizing an exception to Rule 606(b) where racial bias by a juror is alleged).

However, in the instant case none of these exceptions to the rule against juror testimony are applicable. The juror's questionnaire responses, read within the context of the questions posed, do not indicate that she concealed a prejudice or bias on voir dire. More importantly, the juror's written reflections, which explain why she joined in the verdicts rendered by the jury, are thought processes and as such are inadmissible under Minn. R. Evid. 606(b).[2] Therefore, the trial court did not abuse its discretion in denying appellant a *Schwartz* hearing.

## II.

▮ Appellant also challenges his convictions as not supported by the evidence. When faced with a sufficiency of the evidence claim, we view the evidence in the light most favorable to the verdict and assume that the jury disbelieved any testi-

---

**2.** Even were we inclined to consider the juror's responses as evidence, the responses do not support a conclusion that the trial court abused its discretion in denying appellant a *Schwartz* hearing. The statement appellant focuses on, "I know a person is supposed to be innocent until proven guilty, but in reality it didn't work that way," cannot be taken out of context. In addition to this statement, the juror also commented that she wanted the defendant to be not guilty, because while he made poor choices he did not seem to be a threat to society. Further, the juror joined with the other members of the jury in voting to acquit appellant of two counts of first-degree murder. Considering the juror's comments in this context and in the light of the verdicts actually rendered, it appears that while she felt sympathy for the appellant, the evidence did not create a reasonable doubt as to the two counts of murder resulting in guilty verdicts.

mony that conflicts with the verdict. *See State v. Thames*, 599 N.W.2d 122, 126–27 (Minn.1999). Circumstantial evidence is accorded as much weight as other kinds of evidence. *See id.* at 127.

Appellant argues that there was insufficient evidence to support either of his convictions. In particular, appellant claims that the only evidence indicating that he participated in the murder was the testimony of Dean, who was an accomplice. Accomplice testimony is "inherently untrustworthy and must be supported by independent evidence." *State v. Bergeron*, 452 N.W.2d 918, 924 (Minn.1990). Accordingly, a conviction cannot rest on the uncorroborated testimony of an accomplice. *See* Minn.Stat. § 634.04 (1998);[3] *State v. Mathiasen*, 267 Minn. 393, 398, 127 N.W.2d 534, 538 (1964).

Corroborating evidence may consist of: physical evidence associated with the crime, *see Bergeron*, 452 N.W.2d at 924; the testimony of eyewitnesses and experts at trial, *see State v. Norris*, 428 N.W.2d 61, 67 (Minn.1988); inadequacies and admissions in a defendant's testimony, *see State v. Scruggs*, 421 N.W.2d 707, 713 (Minn.1988); and suspicious and unexplained conduct of an accused before or after the crime, *see Mathiasen*, 267 Minn. at 398, 127 N.W.2d at 538. Further,

> [c]orroborating evidence may be secured from the defendant's association with those involved in the crime in such a way as to suggest joint participation, as well as from the defendant's opportunity and motive to commit the crime and his proximity to the place where the crime was committed. The defendant's entire course of conduct may be looked to for corroborating circumstances. If his connection to the crime may be fairly inferred from those circumstances, the corroboration is sufficient.

*State v. Adams*, 295 N.W.2d 527, 533 (Minn.1980) (citation omitted).

The "quantum of corroborating evidence required in any case" depends on the circumstances of the crime. *Mathiasen*, 267 Minn. at 399, 127 N.W.2d at 539. Corroborating evidence need not establish a prima facie case of the defendant's guilt. *See State v. Ford*, 539 N.W.2d 214, 225 (Minn.1995). It is sufficient if it "reinforces the truth of the accomplice's testimony and points to the defendant's guilt in some substantial degree." *State v. Bowles*, 530 N.W.2d 521, 532 (Minn.1995). Corroborating evidence may be either circumstantial or direct, and is viewed in the light most favorable to the verdict. *See Ford*, 539 N.W.2d at 225.

Appellant specifically argues that there is no corroboration of the accomplice testimony that Dean and appellant entered Anderson's mobile home a second time with the intent to commit a burglary and that appellant actually participated in the murder of Anderson. Our review of the record reveals that many of the facts from the testimony by the accomplice, Dean, are corroborated by other witnesses or the physical evidence and point to appellant's guilt. First, the following physical evidence corroborates that both appellant and Dean were present at the murder scene, that appellant participated in the murder, and that a burglary occurred: (1) there were two sets of bloody shoe prints at the scene, indicating that both persons were close to the body after significant blood was shed; (2) both appellant and Dean were wearing new shoes after the murder; (3) surfaces at the crime scene were wiped clean, consistent with Dean's testimony that he and appellant covered their hands to prevent leaving fingerprints and that Dean wiped the surfaces after appellant touched them; and (4) a VCR with the

---

**3.** Minnesota Statutes § 634.04 provides that: A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

victim's blood on it was recovered from a friend of Dean's and appellant's.

In addition, appellant's own testimony placed him at the scene of the murder, and his admitted association with Dean both before and after the murder suggests joint participation. Further, when Dean described the murder to Lundeen and Moses in front of appellant, appellant did not deny his involvement, and even made sounds suggesting that he agreed with Dean's statements.

 Finally, Moses' testimony corroborated nearly all of Dean's testimony, including that appellant's shoes had a dotted tread pattern, that appellant and Dean returned to Anderson's for the purpose of stealing his TV, and that appellant participated in the murder. Appellant argues, however, that Moses' testimony may not be used to corroborate Dean's testimony because Moses was an accomplice-after-the-fact. "Accomplice testimony * * * may not be corroborated solely by the testimony of another accomplice." *State v. Harris*, 405 N.W.2d 224, 227 (Minn.1987). However, "[t]he general test for determining whether a witness is an accomplice is whether he could have been indicted and convicted for the crime with which the accused is charged." *State v. Jensen*, 289 Minn. 444, 446, 184 N.W.2d 813, 815 (1971); *see also State v. Landro*, 504 N.W.2d 741, 745 (Minn.1993); *Harris*, 405 N.W.2d at 228. We have previously stated that

> where the acts of several participants are declared by statute to constitute separate and distinct crimes, the participants guilty of one crime are not accomplices of those who are guilty of a separate and distinct crime. Thus, a person who feloniously receives stolen goods is not an accomplice of the thief; and an accessory after the fact is not an accomplice of the principal.

*State v. Swyningan*, 304 Minn. 552, 555, 229 N.W.2d 29, 32 (1975) (citations omitted).

In the instant case, Moses has a solid alibi for his whereabouts at the time of the murder, and neither appellant nor Dean implicated Moses in the murder. At the time of appellant's trial, Moses had not been indicted or charged with first- or second-degree murder, or any other crime related to the murder. It may be true, as appellant claims, that Moses was better friends with Dean and that Moses received use immunity for his testimony. However, these concerns go to Moses' credibility, which was for the jury to consider. A similar situation arose in *State v. Landro*, where two men were indicted for the same murder, and then one accepted a plea offer and testified against the other. *See Landro*, 504 N.W.2d at 745–46. The accomplice's testimony in *Landro* was corroborated by his brother, who was also present when the murder occurred, but this court held that because the brother had not been indicted he was not an accomplice and his testimony could properly corroborate the accomplice's testimony. *See id.* We noted that while a familial relationship between accomplice and corroborating witness might suggest a bias, "cross-examination is an ample tool by which to expose the presence of possible bias to the jury." *Id.*

Accordingly, Moses' testimony was properly used to corroborate Dean's testimony. Even so, we note that it is critical to our analysis here that Moses testified not only to what Dean told him happened, but also as to what *appellant* told him happened the night of the murder. Moses was not an eyewitness to the murder so his testimony was based on what he learned from Dean and appellant. According to Moses, appellant told him the same story about the murder as Dean had told him, with only minor inconsistencies. In light of the fact that Moses' recitation of what *appellant* told him corroborated Dean's testimony, we are not faced with the question of whether an accomplice's testimony can be corroborated by a third person who is not an eyewitness to the crime and whose knowledge of the crime comes *solely* from what the accomplice relayed to him.

Therefore, because witness testimony and physical evidence corroborate Dean's testimony that appellant entered Anderson's mobile home for the purpose of committing a burglary and participated in the murder, we hold that the evidence is sufficient to sustain appellant's convictions for first- and second-degree murder.

Affirmed.