Ryan Michael PEDERSON,
petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. A04–63.

Supreme Court of Minnesota.

Feb. 24, 2005.

Deborah Ellis, St. Paul, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, St. Paul, MN, Robert M.A. Johnson, Anoka County Attorney, Marcy S. Crain, Assistant County Attorney, Anoka, MN, for Respondent.

## OPINION

BLATZ, Chief Justice.

Appellant Ryan Michael Pederson was convicted in the Tenth Judicial District of aiding and abetting first-degree murder while committing burglary under Minn. Stat. § 609.185(3) (2004) and aiding and abetting second-degree intentional murder under Minn.Stat. § 609.19(1) (2004) and was sentenced to life in prison. Appellant directly appealed to this court, arguing *inter alia* that the uncorroborated accomplice testimony of Stephen Dean provided the only evidence that appellant participated in the murder. *State v. Pederson,* 614 N.W.2d 724 (Minn.2000) (*"Pederson I"*). This court affirmed appellant's conviction, concluding that the physical evidence and the testimony of Tony Moses, a key state witness, corroborated the testimony of appellant's accomplice. *Id.* at 732–34.

Upon learning that Moses had prepared for trial using a seven-page summary ("Summary") of his police statement and grand jury testimony compiled by the state but not disclosed to appellant's counsel, appellant filed a petition for postconviction relief claiming he was entitled to a new trial due to newly discovered evidence, prosecutorial misconduct, improper vouching, and subornation of perjury. The postconviction court summarily denied appellant's request for relief, adopting ver-

batim the state's proposed findings, conclusions, and order denying postconviction relief without affording appellant's counsel the opportunity to review those submissions or to provide alternate versions. *Pederson v. State*, 649 N.W.2d 161, 163 (Minn.2002). This court reversed and remanded for reconsideration, stating that little deference attached to "a postconviction order exonerating the prosecution of allegations of serious misconduct when that order is predicated ex parte on findings and conclusions drafted by the prosecution." *Id.* at 164.

On remand, the case was transferred from the Tenth Judicial District to the Seventh, and a two-day postconviction evidentiary hearing was held. The postconviction court concluded that appellant's right to a fair trial was not compromised by the state's nondisclosure of the Summary and that the state's conduct did not deny appellant a fair trial. We affirm the postconviction court's denial of relief.

The victim, Robert Anderson, a 32–year–old man, was found in his home beaten and stabbed to death on August 20, 1997. *Pederson I*, 614 N.W.2d at 726. On May 14, 1998, a grand jury indicted appellant, Ryan Michael Pederson, and his close friend Stephen Dean on three counts of first-degree murder and aiding and abetting first-degree murder. *Id.* at 727. Dean subsequently entered into a plea agreement with the state and testified at appellant's trial.[1] *Id.* at 727. Appellant was convicted by a jury of first-degree murder committed in the course of a burglary and second-degree murder. *Id.* at 730.

Tony Moses was a close friend of both Dean and appellant. At the time the mur-

der took place, Dean was 20 years old, Moses was 18, and appellant was 17. Moses was not involved in the killing, but he spoke with both Dean and appellant by telephone shortly after the murder and then again in person at Dean's house six or seven hours later. Further, Moses saw Dean and appellant frequently in the days following the killing, and he spoke with each man individually about how the killing took place.

Six days after the murder, the police responded to a report that someone was breaking into Anderson's mobile home. The first officer on the scene observed a man carrying a chair from Anderson's home to Dean's mobile home next door. The officer pursued the man into Dean's home, where he found appellant, Dean, Moses, and three others. All were arrested and taken to the station. Subsequently, Moses gave two recorded statements to the police and testified at the grand jury proceedings.

Moses was uncooperative during his first statement to the police. He then retained an attorney, who negotiated an agreement with the state that provided Moses with "use" immunity during his second police statement and his grand jury testimony. The terms of this immunity were set forth in a letter prepared by the state, which stated that "nothing [Moses] says during the statement could be used against him in any criminal prosecution."[2] However, the state stipulated that "[o]nce [Moses] has given the statement to law enforcement, whatever information and/or evidence law enforcement obtains as a result of information provided by [Moses] could still potentially be used against [Mo-

---

1. Dean pleaded guilty to burglary in the first degree and to aiding and abetting intentional second-degree murder. *Pederson I*, 614 N.W.2d at 727.

2. The parties did not seek court approval of immunity under Minn.Stat. § 609.09 (2004), relying instead on the agreement written by the state.

ses] in any future criminal prosecution." The state further noted that "[t]he granting of 'use immunity' does not, in any manner, limit or prohibit the State's ability to pursue charges against [Moses] based upon otherwise admissible evidence."

After agreeing to the terms of the offer of use immunity, Moses gave a second statement to the police and related the details of his interactions with appellant and Dean after the murder. The state later asked Moses to waive the immunity granted in the agreement before testifying at the grand jury so that Moses could testify "freely" and "voluntarily." After consulting with his attorney, Moses agreed to do so, and testified before the grand jury without immunity.

At trial, both Dean and appellant testified that they went together to Anderson's home, located next door to Dean's home, on the night of the murder. However, their testimony regarding how the killing occurred differed dramatically. According to Dean, the two devised a plan to steal Anderson's television, and they discussed the possibility of having to kill him in the process. Dean testified that once they were at Anderson's home, appellant began physically assaulting him—progressing from "elbowing" to "stomping" to "kicking." Dean stated that while appellant beat Anderson, he (Dean) looked through Anderson's home in search of things to steal, but that at one point during the assault he helped appellant by holding Anderson down. According to Dean, it was appellant who decided it was necessary to kill Anderson, which appellant accomplished by beating him with the stock of a rifle and stabbing him multiple times with a kitchen knife.

In contrast, appellant testified that he and Dean went to Anderson's home to drink and smoke marijuana, but they never discussed stealing anything. According to appellant, in the course of their visit, Dean and Anderson began to argue. The argument escalated into a physical fight between Dean and Anderson. Appellant testified that after the two men "wrestled" on the sofa, Dean got up, leaving Anderson free to walk down the hallway where he could have left through the back door. Instead, according to appellant, Anderson "charged" Dean and the two began wrestling again, stopping only when Anderson's VCR fell and broke. Dean then kicked Anderson's small dog down the hallway. Anderson retrieved the dog from the hallway, but did not leave through the back door. Rather, according to appellant, he returned with a rifle from the back room. Dean then wrestled the rifle away from Anderson and proceeded to physically assault him with his fists and the rifle. Appellant stated he did not intervene in the fight, but instead repeatedly asked Dean to leave with him. Appellant then left alone, going next door to Dean's home to wait for Dean to return.

About 6:00 a.m., Dean returned to his home and paged Moses. Moses called Dean's number and spoke with Dean, who told Moses he needed help to "get rid of some stuff." Moses testified that Dean said, "We killed the neighbor." During this conversation, Moses testified that he could hear appellant in the background "freaking out." Moses called again and this time spoke with appellant, asking him, "Did you guys really do it?" Appellant answered, "Yeah, the neighbor is dead," and then told Moses that he and Dean took a VCR and a television from Anderson.[3]

---

**3.** In his second police statement, Moses was unclear regarding Dean's and appellant's statements to him during the Moses–

Dean/Moses–appellant phone conversations the morning after the killing. Moses made the following statements as he related the

Dean's testimony regarding the two telephone calls conformed to the substance of Moses' testimony. Appellant's testimony regarding the calls, however, differed in two ways from Moses' account. First, appellant testified that he heard Dean tell Moses that *he* (Dean) "just killed the neighbor." Second, appellant denied telling Moses that he and Dean had taken anything from Anderson's home, although he confirmed that he told Moses "the neighbor is dead." Immediately after speaking with both Dean and appellant, Moses testified that he told his girlfriend, the "D——heads just killed the neighbor." She testified that on the morning of the murder she observed Moses on the phone, and that when the call was completed he told her about the conversations he had just had.

Following the early-morning murder, Dean and appellant spent the day together, going to McDonald's for breakfast, then running multiple errands, including buying new tennis shoes, before returning to Dean's home. When they returned, Moses and another friend were waiting for them. Dean testified that he and appellant had put their bloody clothes and tennis shoes into a garbage bag and asked Moses to dispose of it. Moses then asked if he could have appellant's discarded shoes, which were fairly new. After appellant agreed, Moses took the bag and drove to a nearby lake, where he stopped and tried on appellant's shoes. After finding they were too big, Moses put them back into the bag and threw the bag in a dumpster. Moses testified that the distinctive "dot pattern" on the shoes' soles matched the bloody footprints left on Anderson's floor. The coro-

ner testified that this same "dot pattern" was consistent with the pattern found on Anderson's sweater, specifically testifying that it was "almost certain" that marks on Anderson's body were caused by the person who was wearing the shoes "stomping" with "violent force" on his back. Dean corroborated that the shoes appellant wore the night of the murder had a dot pattern on the sole.

Moses testified that during the days following the murder, he had separate, private conversations with both Dean and appellant. According to Moses, and confirmed by Dean at appellant's trial, in one conversation Dean related the details of the killing to Moses. Moses stated that in a subsequent conversation with appellant, appellant's version of events was generally consistent with Dean's, but much less detailed. As Moses recalled, appellant "made it seem like he just kicked [Anderson] and [Dean] just kicked him, and that's about it ... and elbowed him." Appellant testified that he never said anything to Moses about participating in the killing.

Appellant was found guilty by the jury and his conviction was affirmed on direct appeal to this court. One month after appellant's direct appeal failed, on August 6, 2000, Moses sent a letter to appellant's trial counsel. In this letter Moses stated that he could not sleep at night because he was unable to get appellant's case "off his mind." He stated:

> They interviewed me so much and through the whole thing what came out of whose mouth wasn't that clear to me to this day. I'm not saying I was lying,

---

details of his phone conversations with Dean and appellant: "[Dean] told me he killed his neighbor"; "They said they killed their neighbor"; "And [Dean] goes I killed my neighbor or something"; "[Appellant said] 'We killed, we killed the neighbor.'" At the grand jury,

Moses testified that Dean said, "We just killed the neighbor" while appellant said, "The neighbor is dead." When pressed by the state, Moses affirmed that Dean, not appellant, said, "We killed the neighbor."

but through all of what came out of whose mouth I had to try to remember got twisted I think from my statement. I had to stick to certain things and remember it so I thought it was the truth. * * * Things would go on paper and I was asked to remember key things[.] It really was just too much it really confu[sed] me.[4]

In his letter to appellant's counsel, Moses enclosed a copy of the Summary, a seven-page document that the state had given. him before trial that summarized key parts of his police statement and grand jury testimony. On the cover of the Summary was a post-it note stating, "Tony, Please read this and be VERY familiar with the info. Read it several times. Thank you!" The Summary was written in a "script" format and represented five conversations Moses had with Dean and appellant, individually and together, after the murder.

At the postconviction evidentiary hearing, Moses testified that he met with the prosecutors, Assistant Anoka County Attorneys Alan Pendleton and Sean Gibbs, prior to trial. Specifically, Moses stated that he met with Pendleton two or three times prior to the grand jury hearing and roughly six to twelve times prior to trial, although he had difficulty remembering details from more than five or six of the meetings. Moses stated he was scared during these meetings and felt pressured to cooperate with the state in order to avoid being prosecuted for disposing of evidence after the murder and interfering with a murder investigation. He also believed that the state did not want him to talk with the defense investigator, and that

he would "jeopardize" himself if he did so. Moses acknowledged that he chose to waive his immunity after consulting with his attorney and that he agreed to the waiver because he believed if he "cooperated," he was less likely to be prosecuted.

When testifying at the postconviction evidentiary hearing, Pendleton and Gibbs both denied ever telling Moses not to meet with the defense investigator. Further, both prosecutors testified that they consistently told Moses to tell the truth, and that they did not imply that Moses would face prosecution if he did not testify in a particular way.

Pendleton stated that he offered Moses use immunity for his second police statement because the investigators had few leads and it appeared that Moses had critical information. After Moses gave his second statement under use immunity, Pendleton met with Moses, his attorney, and his mother to discuss the possibility of Moses waiving his immunity prior to testifying before the grand jury. Pendleton stated that he asked Moses to waive his immunity because it was Pendleton's "preference * * * to have a witness that was willing to testify at both the grand jury and the trial freely, voluntarily, with no agreements and no immunity." Pendleton testified that he specifically told Moses, his attorney, and his mother to discuss the waiver and notify him of their decision at their convenience.

Pendleton further testified that he met with Moses two to four times, and never alone. In contrast, Moses testified that just before appellant's trial he met with Pendleton alone, and that Pendleton told him to pick up a document from Kelly

4. August 20, 2000, marked the end of the three-year statute of limitations for the state to bring charges against Moses. Moses acknowledged during his testimony at appellant's postconviction evidentiary hearing that

he knew "it was a period of time they couldn't charge me with it," but said he did not specifically know that August 20 marked the expiration of the statute of limitations.

Nicholson, who worked in the Victim/Witness Assistance Program. Nicholson testified that she gave a document to Moses at Pendleton's request, and that the post-it note on the front reflected the directions Pendleton gave her. This document was the Summary. Gibbs and Pendleton testified that the Summary had been created by Gibbs as a condensed version of Moses' grand jury testimony for Pendleton's use in trial preparation, and that they considered it to be attorney work-product. Gibbs and Pendleton further stated that they were not aware, until after the trial, that Moses had been given the Summary. When pressed by appellant's counsel, Pendleton stated that he did not "deny that Miss Nicholson gave it to Mr. Moses" at his request, but that he "honestly [did not] have a recollection of that."

At the postconviction hearing, appellant's counsel led Gibbs through the Summary in careful detail, and Gibbs correlated its text to Moses' previous statements to the police and grand jury. Gibbs acknowledged that he used names with colons to condense Moses' rendition of conversations—e.g.: "Dean: You got to get over here right now." However, Gibbs asserted that the Summary accurately represented Moses' statements without adding or deleting material information.

On appeal to this court, appellant claims that the postconviction court erred in concluding that the state's failure to disclose the Summary did not prejudice appellant's right to a fair trial. Appellant also argues the postconviction court erred in concluding that the state's conduct was proper, presenting several theories under which he claims prosecutorial misconduct should have been found.

## I.

■ A defendant is permitted to seek postconviction relief "to vacate and set aside the judgment * * * or grant a new trial * * * or make other disposition as may be appropriate." Minn.Stat. § 590.01, subd. 1 (2004). The defendant has the burden of showing, by a fair preponderance of the evidence, facts warranting a new trial. Minn.Stat. § 590.04, subd. 3 (2004). We will overturn a postconviction court's decision only when we find an abuse of discretion, and we will consider only whether sufficient evidence supports the postconviction court's conclusions. *Woodruff v. State*, 608 N.W.2d 881, 884 (Minn.2000). We review a postconviction court's determinations of legal issues de novo. *See State v. Rewitzer*, 617 N.W.2d 407, 412 (Minn.2000).

We first address appellant's claim that under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), he was denied a fair trial because the state erred when it failed to disclose the Summary to appellant's trial counsel, and that the state compounded the alleged error in its closing argument. In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. The Court has subsequently defined three components necessary for a "true *Brady* violation." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). First, the evidence at issue must be favorable to the accused, either because it is exculpatory or it is impeaching. *Id.* Second, the evidence must have been suppressed by the state, either willfully or inadvertently. *Id.* at 282, 119 S.Ct. 1936. Third, prejudice to the accused must have resulted. *Id.* All three components must be met in order for a *Brady* violation to be found. *Id.*

The first two components of the *Brady* test are embodied in Rule 9.01 of the Minnesota Rules of Criminal Procedure, which provides that the state must disclose to defense counsel "any relevant written or recorded statements which relate to the case within the possession or control of the prosecution" as well as "any material or information within the prosecuting attorney's possession and control that tends to negate or reduce the guilt of the accused as to the offense charged." Minn. R.Crim. P. 9.01, subd. 1(2), (6).

The postconviction court concluded that under the first two *Brady* components and the disclosure obligations set forth in Minn. R.Crim. P. 9.01, the state should have disclosed the Summary. We agree with the postconviction court. The Supreme Court has stated that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' non-disclosure of evidence affecting credibility falls within" the *Brady* rule. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)). Here, Moses' testimony played a significant role in the state's case against appellant, and it was based in part on Moses' review of the Summary. Had appellant's trial counsel known of the Summary and the use to which Moses put it, he could have used the Summary to impeach Moses' credibility. Given this, the state's failure to disclose the Summary was error.

▪ However, the Supreme Court has stated that "[w]e do not * * * automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict." *Giglio*, 405 U.S. at 154, 92 S.Ct. 763 (quoting *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir.1968)); *see also* *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (stating impeachment evidence falls within the *Brady* rule). Rather, in order for a new trial to be granted, the evidence must be "material" under the third prong of *Brady*. *Giglio*, 405 U.S. at 154, 92 S.Ct. 763 (citing *Brady*, 373 U.S. at 87, 83 S.Ct. 1194).

▪ Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375. A "reasonable probability" is one that is "sufficient to undermine confidence in the outcome." *Id.* Here, the postconviction court determined the evidence was not material. The standard of review for a lower court's *Brady* materiality ruling is an issue of first impression for this court. Sister jurisdictions have concluded that a *Brady* materiality analysis involves a mixed question of fact and law. *See, e.g., United States v. Pelullo*, 14 F.3d 881, 886 (3d Cir.1994); *United States v. Perdomo*, 929 F.2d 967, 969 (3d Cir.1991); *Carter v. Rafferty*, 826 F.2d 1299, 1306 (3d Cir.1987); *State v. Rice*, 755 A.2d 137, 151 (R.I.2000); *Helm v. State*, 1 P.3d 635, 639 (Wyo.2000); *State v. Marshall*, 148 N.J. 89, 690 A.2d 1, 49 (1997). We agree and conclude that, because materiality issues under *Brady* combine issues of fact and law, the proper standard of review is de novo. *See State v. Rhodes*, 657 N.W.2d 823, 842 (Minn.2003).

Appellant argues that the Summary is material because it could have been used by appellant's trial counsel to suggest that Moses' testimony was "scripted" by the state, thereby undermining Moses' and the state's credibility in the eyes of the jury. Appellant also argues that if Moses had been limited to relying on his own memory, he would not have been able to recollect accurately what occurred in August

1997. We are not persuaded by appellant's arguments, however, because they fail to acknowledge that the breadth of information Moses consistently related in his police statement, grand jury testimony, and trial testimony significantly exceeded the scope of the five brief conversations set forth in the Summary.

For example, Moses testified in detail at appellant's trial about his activities on the night of the murder, including the party he attended at Dean's home, the type of shoes appellant was wearing, and the pattern on the soles of the shoes. Moses also recounted details from a party he attended at a hotel, a cut he received on his hand, the subsequent trips to his home, to the emergency room, then back home again. Moses also provided specific details about the circumstances surrounding the early-morning telephone calls he made to Dean's home after the murder—details corroborated by the testimony of Moses' girlfriend. After describing the bag into which Dean had put the clothing worn during the murder, Moses then recounted where he took the bag, what the bag contained when he opened it, how he tried on the shoes and found them to be too big, what the soles of the shoes looked like, why he agreed to discard the bag, and where he discarded the bag. This "extra-Summary" testimony demonstrates that Moses' recollection of the events surrounding the murder went beyond the conversations represented in the Summary, and Moses' recollection of many details—the pattern on the soles of appellant's shoes, his description of the bag and the bloody

clothes it contained, and his statements regarding the size of appellant's shoes—were all corroborated by Dean's testimony and incriminated appellant.[5] Importantly, when asked at the postconviction hearing whether he lied during his trial testimony, Moses replied, "[n]o, not at all."

For the foregoing reasons, we conclude that because there is "no reasonable probability" that the result of the trial would have been different had the state disclosed Moses' use of the Summary to appellant's trial counsel the prejudice prong of *Brady* was not met. We therefore hold that appellant's right to a fair trial was not compromised by the state's nondisclosure of the Summary.

## II.

We now turn to appellant's claim that the state improperly allowed false testimony to go uncorrected. Where it is alleged that false testimony was given at trial, the postconviction court evaluates the claim under the three-prong test in *State v. Caldwell*, 322 N.W.2d 574, 584–85 (Minn.1982). In order for a new trial to be granted, (1) the court must be reasonably satisfied that the trial testimony was false; (2) without the false testimony, the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise at trial or did not know of the falsity until the trial concluded. *Id.* at 585; *Dukes v. State*, 621 N.W.2d 246, 258 (Minn. 2001). We review a lower court's application of the *Caldwell* test under an abuse of discretion standard. *Dukes v. State*, 660 N.W.2d 804, 818 (Minn.2003). We will not

---

**5.** We further note that if Moses had not been given the Summary, and his memory had significantly failed him at trial, both the state and defense counsel were free to use Moses' previous statements to refresh his memory while testifying. *See* Minn. R. Evid. 612. Certainly, the extent to which a witness must rely on his past recorded statements in order to testify affects that witness's credibility. In this case, however, at appellant's trial, Moses not only recollected significant details that were not part of the Summary, he also firmly maintained his version of events in the face of aggressive cross-examination regarding the inconsistencies in his past statements.

substitute our view of the evidence when there is adequate evidence to sustain the postconviction court's findings of fact. *State v. Robb,* 292 Minn. 409, 412, 195 N.W.2d 587, 589 (1972).

According to appellant, the "most pointedly false" testimony was solicited when Moses testified that he "was never told by Attorney Pendleton what to say or given suggestions of what to say by Attorney Pendleton or his staff." In appellant's view, the Summary was a coaching device provided to Moses in order to elicit certain testimony. Appellant's argument, however, fails to recognize that the Summary was based on Moses' previous statements and did not omit any exculpatory statements. Further, this argument does not account for Moses' postconviction evidentiary hearing testimony that, despite feeling pressured, he did not lie while testifying at appellant's trial. Having reviewed the record before us, we hold the postconviction court did not abuse its discretion in concluding that because the first prong of *Caldwell* was not met, appellant's claim that the state improperly allowed false testimony to go uncorrected failed.

### III.

We next consider appellant's argument that his right to a fair trial was compromised by the manner in which Moses waived his immunity prior to testifying before the grand jury. Specifically, appellant claims that the state improperly pressured Moses to waive the "use immunity" it had granted, and that Moses' decision to do so created a "charade" which allowed the state to receive the "benefit of a witness testifying without the cloak of immunity" while that witness was, in fact, "protected from prosecution." The postconviction court concluded that appellant's argument that Moses was improperly

pressured to waive his immunity was "without legal validity."

We first observe that Moses' use immunity was based solely on the narrow terms set forth by the state, and did not receive formal court approval under Minn.Stat. § 609.09, subd. 1. Under this statute, once the district court has ordered a witness to provide otherwise privileged testimony, "no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony or other information may be used against the witness in a criminal case." *Id.* In contrast, the use immunity to which Moses agreed with the advice of counsel was much narrower. The state specifically provided that Moses' use immunity applied only to his second police statement and grand jury testimony, and that "[o]nce [Moses] has given the statement to law enforcement, whatever information and/or evidence law enforcement obtains as a result of information provided by [Moses] could still potentially be used against [him] in any future criminal prosecution." Thus, although Moses could have refused to waive his use immunity during his grand jury testimony, the immunity his counsel had negotiated did not apply to his trial testimony or eliminate the risk of future prosecution.

Significantly, appellant's trial counsel aggressively cross-examined Moses regarding his decision to waive immunity, and strongly implied to the jury that Moses did so under pressure from the state. On cross-examination at appellant's trial, Moses stated that he waived his grant of immunity after consulting with his own attorney, and that he did so without any "promises or guarantees" from the state regarding the possibility that he may face criminal charges. At the postconviction hearing, Moses confirmed that he consent-

ed to waiving his immunity with the advice of his attorney.

We acknowledge that Moses' testimony that he waived his immunity because "it'd be better for me pretty much" lends credence to appellant's position that the waiver was a "charade" in which the state was able to present a witness who had waived his immunity but who, in fact, believed he would benefit from his decision to do so. While we are troubled by the unfolding of these events, our concern is allayed by the fact that the jury was well aware of the circumstances surrounding Moses' decision to waive his immunity. Moreover, the jury knew that, at the discretion of the state, Moses faced the possibility of being criminally charged for his activities after the murder. Thus, the "charade" of which appellant complains was transparent, and the jury was free to draw whatever conclusions—impeaching or otherwise—the circumstances suggested. For these reasons, we hold that the postconviction court did not abuse its discretion when it concluded that appellant's right to a fair trial was not compromised by the manner in which Moses waived his immunity.

### IV.

Finally, we consider appellant's claims that the state improperly impeded the defense investigator's access to Moses. The postconviction court concluded that this claim was procedurally barred because appellant was aware of it at the time of his direct appeal, and no new evidence regarding this claim was presented at the postconviction hearing. Once a direct appeal has been taken, any matter raised and any claim known but not raised will not be considered upon a subsequent petition for postconviction relief. *Black v. State*, 560 N.W.2d 83, 85 (Minn.1997) (citing *State v. Knaffla*, 309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976)). Two excep-

tions to the *Knaffla* rule exist: (1) when the claim is so novel that the legal basis was not available on direct appeal; or (2) when fairness requires consideration of a claim that the petitioner did not deliberately and inexcusably fail to raise on direct appeal. *Dukes*, 621 N.W.2d at 251 (citing *Roby v. State*, 531 N.W.2d 482, 484 (Minn. 1995)).

The record supports the postconviction court's conclusion that appellant's claim—that defense counsel's investigator's access to Moses was impeded—was procedurally barred. Appellant's trial counsel knew that Moses refused to speak with his investigator and cross-examined Moses on this point. Further, no new evidence regarding Moses' refusal to talk with defense counsel's investigator arose after the direct appeal. Thus, the postconviction court did not abuse its discretion in concluding that *Knaffla* barred appellant from raising this claim.

Affirmed.

ANDERSON, G. BARRY, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.