# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-2582

_____

Ryan Michael Pederson,

         Appellant,

v.

Joan Fabian, Minnesota Commissioner
of Corrections,

         Appellee.

\*
\*
\*
\*
\*   Appeal from the United States
\*   District Court for the
\*   District of Minnesota.
\*
\*
\*
\*

_____

Submitted: January 11, 2007
Filed: June 13, 2007
Substituted: June 19, 2007

_____

Before WOLLMAN and MELLOY, Circuit Judges, and NANGLE,[1] District Judge.

_____

MELLOY, Circuit Judge.

_____

[1]The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

Ryan Michael Pederson appeals the district court's[2] denial of his petition for habeas relief under 28 U.S.C. § 2254. Pederson alleges prosecutors failed to disclose material, exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963), and deprived him of due process and a fair trial by using false and orchestrated testimony and vouching for the credibility of a witness. Pederson also alleges he was denied due process and deprived of a fair trial because one juror stated during voir dire that she would faithfully apply the law but averred post-trial that she failed to extend to Pederson a presumption of innocence. We affirm the judgment of the district court.

I.    Background

This case stems from the murder of Robert Anderson. A jury convicted Pederson of aiding and abetting the first-degree murder of Anderson in the course of a burglary. Minn. Stat. § 609.185(3) (1997). The jury also convicted him of second degree murder. Minn. Stat. § 609.19(1) (1997). Pederson is currently serving a life sentence for his crimes. The facts of the underlying offense and the evidence presented at trial are set forth in detail in the opinion from Pederson's direct state appeal. State v. Pederson (Pederson I), 614 N.W.2d 724, 726-30 (Minn. 2000). Additional details surrounding the procedural history of this case are provided in opinions from an appeal of a first denial of postconviction relief, Pederson v. State (Pederson II), 649 N.W.2d 161, 162-64 (Minn. 2002), and an appeal from a post-remand, second denial of postconviction relief. Pederson v. State (Pederson III), 692 N.W.2d 452, 454-459 (Minn. 2005). We summarize the facts as relevant to Pederson's current claims.

--------

[2]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota, adopting the report and recommendation of the Honorable Janie S. Mayeron, United States Magistrate Judge for the District of Minnesota.

Anderson was the thirty-two-year-old neighbor of Stephen Dean, Pederson's co-defendant in this case. Anderson's body was found in Anderson's home the night following his murder. At the crime scene, Anderson was face down in a pool of blood and appeared to have been beaten with a blunt object, kicked, and stabbed. Spattered blood, a broken rifle, the handle of steak knife, and bloody footprints were located near Anderson's body. One of the footprints had a distinctive athletic tread design and matched a footprint found on Anderson's back. A medical examiner testified that the footprint resulted from someone stomping with substantial force on Anderson's back.

Six days after officers discovered Anderson's body, they received a call that people were disturbing the crime scene. Officers arrived at the scene and saw someone carrying a chair out of Anderson's home and into Dean's home. The officers went to Dean's home, where they found Dean, Pederson, Anthony Moses, and others. The men admitted they had been looking into Anderson's home. The officers arrested the men and later noted that Dean and Pederson were wearing new athletic shoes.

Moses, who claimed to have spoken with Dean and Pederson shortly after the murder, initially received use immunity and provided information that helped prosecutors build a case against Pederson and Dean. Moses later waived his immunity at the prosecutors' request in order to appear more credible before the grand jury while testifying against Dean and Pederson. Moses did not enter a formal agreement with the prosecutors, but he did hope to avoid prosecution by cooperating. In fact, the state did not bring charges against Moses.

Dean and Pederson were indicted for the murder. Dean pleaded guilty to burglary in the first degree and aiding and abetting intentional second-degree murder, and he agreed to testify against Pederson. Alexander Lundeen, Moses, and Pederson himself also testified at Pederson's trial.

Dean testified in detail as to the circumstances surrounding Anderson's murder, placing the blame on Pederson as the primary culprit. Dean explained that Anderson, Dean, Pederson, and another man had been together at Anderson's home on the evening of Anderson's murder drinking alcohol and smoking marijuana. Eventually, the group dispersed, and everyone except Anderson left Anderson's home. Pederson and Dean then decided to steal Anderson's television and returned to accomplish that task. During the burglary, Dean and Pederson confronted Anderson. Pederson eventually wrestled Anderson to the ground and beat and kicked him until he lost consciousness. Dean then searched the home for other things to steal. Anderson regained consciousness, and Pederson resumed kicking him in the head and ribs. Pederson then asked for Dean's help, and Dean held Anderson while Pederson stomped on Anderson's head. Pederson then used a rifle Dean had found to beat Anderson in the head and torso, breaking the rifle and spattering blood on Pederson's clothes and around the room. After a further search of the apartment by Dean, Pederson stabbed Anderson in the throat with a steak knife, breaking the handle off of the knife in the process.

Pederson testified in detail as to differing circumstances, denied any intent to steal from Anderson, claimed he did not participate in the murder, and placed the blame squarely on Dean. Pederson testified that he and Dean did not leave Anderson's home, but stayed and smoked marijuana with Anderson when the others left. Dean and Anderson then began arguing, the argument escalated, and Anderson told Dean to get out of his home. Anderson eventually grabbed a rifle and told Dean to leave, but Dean wrested the rifle from Anderson's control, and the two of them fell to the ground. Throughout this fight, Pederson implored Dean to leave. Dean would not relent; instead, Dean beat Anderson with the rifle and Pederson fled to a nearby shed. When Pederson later returned to the home, Anderson was dead, Dean had grabbed a VCR, and Dean told Pederson that he had killed Anderson.

Although Dean's and Pederson's stories did not match exactly as to what they did following the murder, both testified that they eventually went for breakfast and then traveled together to a mall where they purchased new shoes. They later met with Moses and Lundeen at Dean's home where they discussed the murder with the other men.

Moses corroborated Dean's version of the story based largely on statements Dean had made to Moses, including statements Dean made to Moses when Dean called Moses from the crime scene to ask for help in getting rid of stolen items. Moses also stated that he talked to Pederson on the day following the murder, and at that time, Pederson corroborated Dean's version of the murder except that Pederson stated Dean had also kicked Anderson, and Pederson did not mention stabbing Anderson. Moses offered to get rid of a bag of Pederson's and Dean's blood-soaked clothes, and Moses asked if he could have Pederson's old shoes. Moses saw two pairs of shoes in the bag, recognized the pair with the distinctive tread pattern as Pederson's shoes, but decided not to keep them because they did not fit. He ultimately threw the bag, clothes, and shoes in a dumpster.

Lundeen testified to a conversation with Dean. Pederson was present for the conversation, but said little. Dean admitted that he "whacked" Anderson, and Dean made animated motions while excitedly relating the story of the crime. Lundeen did not claim Pederson relayed any description of the murder, but stated Pederson merely sat with his head down and occasionally made affirmative sounds while Dean talked of their respective roles in the murder.

The physical evidence corroborated Dean's story more strongly than Pederson's story. For example, the footprint evidence strongly corroborated Dean's story as it placed two men in the vicinity of Anderson's body at a point in time when there was sufficient blood on the floor to create two sets of footprints. Also, the home was wiped clean of fingerprints, as was consistent with a claim Dean made that he and

Pederson covered their hands before returning to burglarize Anderson's home. Further, the police recovered from the home of a friend of Dean and Pederson a VCR that had been stolen from Anderson's home. The VCR had Anderson's blood on it. Finally, as noted, Pederson and Dean were wearing new athletic shoes after the murder. Ultimately, the jury rejected most of Pederson's version of the murder and accepted most of the version relayed by Dean and Moses. The jury found Pederson not guilty of first-degree, premeditated murder but guilty of second-degree murder and guilty of aiding and abetting first-degree murder in the course of a burglary.

Following trial, a number of revelations from the prosecutor and the jury led to claims for relief from Pederson. The first revelation related to jury questionnaires the prosecutor had sent to the jurors to learn their impressions of the trial. Although the prosecutor had sent the questionnaires, defense counsel received an unsigned, typed response with a return address that matched the address of one of the jurors. The typed response included the following comment:

> I wanted more from him presenting a defense. I know a person is supposed to be innocent until proven guilty, but in reality it didn't work that way. The prosecutor presented overwhelming evidence that someone died. The defense needed to present much more evidence that it wasn't [Pederson] that caused the death. [Pederson] obviously was not prepped. He was not led through his testimony like Stephen Dean and Tony Moses were. That worked toward credibility for [Pederson] but against him because [Pederson] wasn't very articulate. [Defense counsel] was the only one who could help [Pederson] be more articulate. I wanted [defense counsel] to ask his witnesses <u>why</u> they didn't say anything or speak to anyone right after the murder. [Defense counsel] went on the premise it should be obvious what the truth is. Unfortunately after the prosecution has offered so much in the way of presentation, it wasn't obvious.

The purported juror response further stated that the juror disbelieved the testimony from Moses and Dean and believed Pederson's testimony. Finally, the

response stated that the juror wanted Pederson to be not guilty and did not believe Pederson was a threat to society. Pederson moved for a judgment of acquittal based on this newly received information or, in the alternative, for a hearing under Schwartz v. Minneapolis Suburban Bus Co., 104 N.W.2d 301, 303 (Minn. 1960), and Minnesota Rule of Criminal Procedure 26.03, subdiv. 19(6), to address the issue of juror misconduct. The trial court denied Pederson's motions, and on direct appeal, the Minnesota Supreme Court affirmed. Pederson I, 614 N.W.2d at 731.

In support of his motion, and on appeal, Pederson argued that the juror who returned the typed response to the questionnaire had to have lied during voir dire because the juror stated during voir dire that she would "uphold the law as instructed by the judge and would presume that the defendant is innocent until proven guilty." Id. at 730. The Minnesota Supreme Court stated that, in order to be entitled to a Schwartz hearing, an aggrieved litigant must first present a prima facie case of jury misconduct. Id. The court then noted that Minnesota Rule of Evidence 606(b) limits the use of juror statements regarding verdicts and deliberations and that Minnesota recognizes only limited exceptions to this rule to expose (1) threats of violence among jurors, (2) outside influences upon jurors, or (3) jurors' concealment of prejudices or biases during voir dire that would have led to disqualification. Id. at 730-31. The court stated that the only arguably applicable exception was the exception dealing with concealed biases or prejudices. The court held, however, that the juror's statement in Pederson's case, "read within the context of the questions posed, [did] not indicate that she concealed a prejudice or bias on voir dire." Id. at 731.

On direct appeal, the Minnesota Supreme Court also rejected claims of insufficient evidence. Pederson argued that his conviction rested solely on Dean's testimony and that Minnesota law demands corroboration of such testimony and prohibits a conviction based solely on the testimony of a co-defendant. State v. Bergeron, 452 N.W.2d 918, 924 (Minn. 1990); Minn. Stat. § 634.04 (1998). The court held that ample corroborating evidence existed, including the testimony of

Moses and Lundeen, corroborating aspects of Pederson's own testimony, and physical evidence such as the two sets of bloody footprints, the fact that Pederson and Dean were both wearing new athletic shoes when arrested, the fact that the surfaces of Anderson's home had been wiped clean of fingerprints, and the fact that a stolen VCR stained with Anderson's blood was recovered from a friend of Dean and Pederson. Pederson I, 614 N.W.2d at 732-33.

Following the direct appeal Pederson discovered that Moses had prepared for trial by reviewing a seven-page summary of his own police statement and grand jury testimony that had been prepared by the prosecutors but not disclosed to Pederson. Pederson discovered this fact when Moses sent the summary to defense counsel along with a letter that stated Moses was unable to sleep at night because he could not get the case out of his head. Moses's letter, sent approximately when the statute of limitations to prosecute Moses expired, stated:

> They interviewed me so much and through the whole thing what came out of whose mouth wasn't that clear to me to this day. I'm not saying I was lying, but through all of what came out of whose mouth I had to try to remember got twisted I think from my statement. I had to stick to certain things and remember it so I thought it was the truth. . . . Things would go on paper and I was asked to remember key things[.] It really was just too much it really confu[sed] me.

The summary that prosecutors provided to Moses set forth dialogue in the format of a script. The summary described portions of Moses's prior statements to police and his grand jury testimony with synopses of Moses's recitations of other persons' statements appearing after those other persons' names as set off by colons. A sticky note was attached to the summary that stated, "Tony, read this and be VERY familiar with the info. Read it several times. Thank you!"

Pederson moved for relief based on this newly discovered evidence, alleging misconduct by the prosecutor, improper prosecutorial vouching for Moses's credibility, and the subornation of perjury. The trial court denied his motion without a hearing and adopted the prosecutor's proposed findings of fact and conclusions of law without providing Pederson an opportunity to review the prosecutor's proposed findings and without permitting Pederson an opportunity to submit any proposed findings of his own.

On a first appeal of these post-conviction claims based on the letter and summary, the Minnesota Supreme Court reversed and remanded "[o]ut of concern that the process employed . . . gives the appearance of impropriety." Pederson II, 649 N.W.2d at 162. The court noted expressly that prosecutors characterized the summary as "nothing more than a condensed form of the grand jury transcripts." Id. at 164 n.2. The court took umbrage with this characterization, stating:

> We think not. The document transformed conversations related by a key state witness before the grand jury into a scripted version of those conversations, much like the work of a playwright. Without regard to its substance, the document does not, as the state claims, "excerpt" the questions asked of the witness and his complete answers to those questions in his grand jury testimony.

Id.

On remand, the case was assigned to a different judicial district, and Pederson received a two-day evidentiary hearing on his postconviction claims. At the hearing, two prosecutors involved with the trial testified and revealed that the summary was prepared by one of the two prosecutors. Neither prosecutor recalled giving the summary to Moses. A staff person from the prosecutors' office stated that the lead prosecutor told her to give the summary to Moses with instructions to have Moses study the summary. She stated that she put the sticky note on the summary as a

reminder to herself of what the prosecutor had instructed her to say to Moses. The prosecutor did not deny instructing the staff member to relay the summary to Moses; the prosecutor merely stated that he did not recall having given any such instructions. Ultimately, the postconviction court denied relief, and the Minnesota Supreme Court affirmed. Pederson III, 692 N.W.2d at 463.

In Pederson III, the Minnesota Supreme Court rejected a claim by Pederson that the failure to disclose the summary of Moses's prior statements was a violation of Brady v. Maryland, 373 U.S. 83 (1963). The Minnesota Supreme Court agreed that the summary was exculpatory evidence in that the summary and the fact of Moses's use of the summary were "'evidence affecting credibility [that] falls within' the Brady rule." Pederson III, 692 N.W.2d at 460 (quoting Giglio v. United States, 405 U.S. 150, 154 (1972)). The court found, however, that the undisclosed summary was not material, as required for relief, because there was no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Pederson III, 692 N.W.2d at 460 (internal quotation omitted).

Pederson argued that the summary was material because trial counsel could have used the summary to argue "that Moses' testimony was 'scripted' by the state, thereby undermining Moses' and the state's credibility in the eyes of the jury [and] that if Moses had been limited to relying on his own memory, he would not have been able to recollect accurately what occurred [at the time of the murder]." Id. at 460-61. The court rejected this argument for three reasons. First, the court noted that Moses's actual testimony was extensive and provided details not included in the state's summary, thus bolstering Moses's credibility and diminishing the impeachment value of the summary. The court stated:

> This "extra-Summary" testimony demonstrates that Moses' recollection
> of the events surrounding the murder went beyond the conversations
> represented in the Summary, and Moses' recollection of many details–
> the pattern on the soles of appellant's shoes, his description of the bag

and the bloody clothes it contained, and his statements regarding the size of appellant's shoes–were all corroborated by Dean's testimony and incriminated appellant.

Id. at 461. Second, the court noted that Moses testified at the postconviction hearing and, although he admitted feeling pressured by prosecutors at the time of trial, he consistently asserted at the postconviction hearing that he did not lie at Pederson's trial. Id. Finally, the court noted that, had Moses not been able to fully recollect his prior statements, counsel for both sides would have been able to refresh his memory using the actual transcripts of his statements to the police and his grand jury testimony. Id. at 461 n.5. There was no suggestion that the actual grand jury testimony or Moses's statements to police were unavailable for review by the defense or for use during the cross-examination of Moses.

Pederson raised three other claims that the Minnesota Supreme Court addressed and rejected. The first was a claim alleging that the prosecution knowingly permitted false testimony to go uncorrected in that Moses testified he "was never told by [the prosecutor] what to say or given suggestions of what to say by [the prosecutor] or his staff." Pederson III, 692 N.W.2d at 462. The court concluded that this claim failed because Moses had not actually been told to lie or told what to say by the prosecution; rather, the summary was "based on Moses' previous statements and did not omit any exculpatory statements." Id. The second and third rejected claims related, respectively, to the manner in which Moses waived his immunity and to an allegation that the state impeded a defense investigator's access to Moses. Pederson does not raise these two claims in the present appeal, and we do not discuss them further.

Following exhaustion of these issues in state court, Pederson filed for federal habeas relief under 28 U.S.C. § 2254. On Pederson's petition for habeas relief, the district court rejected Pederson's arguments but granted a certificate of appealability. Articulation of the claims as set forth in the certificate of appealability does not match precisely the claims as framed in the state courts. The certificate of appealability sets

forth the claims as: (1) whether Pederson was denied a fair trial based on the presentation of false testimony or a false impression; (2) whether failure to disclose the summary comprised a Brady violation; (3) whether during closing argument the prosecutor improperly relied on orchestrated consistency in Moses's testimony; (4) whether the state court made an unreasonable finding of fact when it found that the summary was fair and did not omit exculpatory statements; and (5) whether Pederson was denied an impartial jury. On appeal, Pederson does not present separate arguments on the issue of whether the state court made an unreasonable finding of fact regarding the summary.

II.     Discussion

    A.     Standard of Review

We review the district court's denial of habeas relief de novo. Garcia v. Mathes, 474 F.3d 1014, 1017 (8th Cir. 2007). We grant substantial deference, however, to the Minnesota Supreme Court. We review claims raised before and addressed by the Minnesota Supreme Court under the highly deferential standard set forth in the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), codified in part at 28 U.S.C. § 2254(d), and explained in Williams v. Taylor, 529 U.S. 362 (2000). Under this standard, we may only grant relief if "a decision was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1), (2).

Pederson argues that, as to his claim based on the alleged use of false testimony, deferential review is unwarranted because the Minnesota Supreme Court did not analyze this claim under federal law. While it is true that the Minnesota Supreme Court cited to state law when analyzing the false testimony claim, the state law was consistent with controlling Supreme Court precedent. Compare State v. Caldwell, 322

-12-

N.W.2d 574, 585 (Minn. 1982) (stating that the court must be "reasonably well satisfied that the testimony given by a material witness is false") with Napue v. Illinois, 360 U.S. 264, 269 (1959) (prohibiting the state from knowingly relying upon false testimony or allowing false testimony to go uncorrected). Further, as noted by the district court, the state law cited by the Minnesota Supreme Court was, if anything, more likely to result in relief for defense claims. Finally, it is well established that state courts need not cite the relevant Supreme Court cases so long as the analyses used and results reached are neither contrary to, nor objectively unreasonable applications of, the controlling Supreme Court precedent. Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) ("Avoiding [reversal on federal habeas review] does not require citation of our cases—indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."); see also Jones v. Luebbers, 359 F.3d 1005, 1011-12 (8th Cir. 2004). As a result, Pederson's argument that de novo review should apply to the false testimony claim is without merit.

Pederson also argues that because the district court did not expressly address the "false impression" aspect of his claim, AEDPA deference should not apply to this aspect of his claim. On the facts of the present case, Pederson attempts to slice the meat of his arguments too thinly. As explained below, the Minnesota Supreme Court rejected the false testimony claim on a ground sufficient to defeat both types of claims, namely, that Moses and the prosecution did not mischaracterize the prosecution's role in preparing Moses to testify.

Finally, Pederson argues that the issue of prosecutorial vouching at closing argument is not subject to AEDPA deference because it was not addressed by the state courts. The state argues that AEDPA deference applies. It is not entirely clear to us that, given the nature of Pederson's claims, it is possible to separate the false impression issue from the issue of alleged misconduct at closing argument. The statements at closing that Pederson finds objectionable were statements concerning

Moses's credibility and consistency and seem to be intertwined with the false testimony/false impression claims. Because Pederson's claim related to closing argument fails even under a de novo standard of review, however, we elect to apply that standard without resolving the parties' procedural dispute. See, e.g., Pfau v. Ault, 409 F.3d 933, 939 (8th Cir. 2005) (applying de novo review under § 2254 where procedural history was unclear and relief was unavailable even under the de novo standard).

### B. Brady v. Maryland

Pederson argues that the state's failure to disclose the summary was a Brady violation. Well-settled United States Supreme Court precedent teaches that evidence tending to impeach the credibility of prosecution witnesses may be subject to the disclosure requirements of Brady. See Giglio, 405 U.S. at 154 ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule.") (quoting Napue, 360 U.S. at 269). Here, as correctly found by the Minnesota Supreme Court, the summary is favorable to the accused in that it speaks to the credibility of an important witness for the state. Had the defense been able to inform the jury that Moses studied a summary prepared by the prosecutors, and had the defense been able to show the summary to the jury, the jurors may have viewed Moses as less credible than they otherwise deemed him to be.

Relief is only available under Brady, however, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. When determining whether impeachment evidence such as the summary is material under Brady, the undisclosed impeachment evidence cannot be viewed in isolation. Rather, the impeachment evidence must be viewed in context, alongside the witness's testimony, in light of any other impeachment evidence, and in light of corroborating evidence

that bears on the witness's credibility. <u>Youngblood v. Virginia</u>, 126 S.Ct. 2188, 2190 (2006) ("[A]lthough a 'showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal,' . . . [t]he reversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'") (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 434, 435 (1995)) (internal citations omitted). Pederson argues that the summary was material because it demonstrates that Moses's testimony was scripted, and had the jury seen the script, the jury would have disbelieved Moses and Dean and rejected their version of the murder.

We believe that Pederson's argument erroneously views the summary in isolation and overstates its impeachment value. In contrast, the Minnesota Supreme Court analyzed the <u>Brady</u> evidence in the proper light and applied <u>Brady</u> and its progeny in a manner that was not unreasonable. The summary had only limited impeachment value because the scope of Moses's testimony exceeded the scope of the summary. For a jury to have found that Moses testified in accordance with a script, the jury would have had to ignore the details and specificity of Moses's testimony that were not found in the summary. Further, Moses's actual grand jury testimony and police statements were available for use by the defense. As such, the impeachment value of the summary would have been to a large extent cumulative in light of these resources. Finally, as noted above, the physical evidence corroborated the version of the murder relayed by Dean and Moses more strongly than the version put forward by Pederson, thus lending further support to Moses's credibility. In light of these factors, we do not believe that the Minnesota Supreme Court applied <u>Brady</u> and <u>Bagley</u> in an unreasonable manner. Accordingly, relief is unavailable under AEDPA.

C. False Testimony, False Impression, and Prosecutorial Misconduct/ Vouching

Pederson next argues that Moses testified falsely when he stated that prosecutors did not tell him what to say. Pederson also argues the prosecutors improperly vouched for Moses by emphasizing the consistency between his testimony and his prior statements and left the jury with the false impression that Moses's memory was strong and free from infirmity. The Minnesota Supreme Court addressed only the false testimony aspect of these related due process claims. Citing Caldwell, 322 N.W.2d at 585, the court stated, "In order for a new trial to be granted, (1) the court must be reasonably satisfied that the trial testimony was false; (2) without the false testimony, the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise at trial or did not know of the falsity until the trial concluded." Pederson III, 692 N.W.2d at 461. The court's analysis focused on the first prong of the Caldwell test. The statement from Moses's testimony that is at the center of Pederson's claims is the statement that Moses "was never told by [the prosecutor] what to say or given suggestions of what to say by [the prosecutor] or his staff." Id. at 462. The court determined that this trial testimony was not false and the summary was not a "coaching device provided to Moses in order to elicit certain testimony" as argued by Pederson. Id. Rather, the court characterized the summary as being "based on Moses' previous statements and . . . not omit[ting] any exculpatory statements." Id. The court proceeded to note that Moses maintained during the postconviction proceedings that he told the truth when he testified against Pederson at trial. Id. The court ultimately concluded that Pederson failed to demonstrate that Moses's trial testimony was false. Id. ("[W]e hold the postconviction court did not abuse its discretion in concluding that because the first prong of Caldwell was not met, appellant's claim . . . failed.").

The relevant United States Supreme Court precedents are Giglio v. United States, 405 U.S. 150, 154 (1972), and Napue v. Illinois, 360 U.S. 264, 269 (1959). In

-16-

Napue, the Court recognized, "that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. . . . The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue, 360 U.S. at 269. Under Giglio and Napue, relief is contingent upon a showing that the prosecution knowingly used false testimony. When the Minnesota Supreme Court found that Pederson's claim failed under the first prong of the Caldwell test, it necessarily found that the prosecution had not knowingly used false testimony. Although not citing Giglio or Napue, the state court identified the law as set forth in the controlling United States Supreme Court precedent and applied that precedent in a manner that was not unreasonable.

The Minnesota Supreme Court's conclusion that Moses's statement was not false was not unreasonable because Moses's statement was ambiguous and subject to multiple reasonable interpretations. Interpreted broadly (as advocated by Pederson), Moses's testimony that he was not told what to say could be viewed as a claim that there was a complete lack of witness preparation by the prosecution. Viewed more narrowly (as done by the Minnesota Supreme Court and as advocated by the state), Moses's statement could be interpreted as a claim that prosecutors did not tell Moses to lie or that prosecutors did not tell Moses specifically what words to say.

Given the ambiguity inherent in Moses's statement, this is not a case like Napue or Giglio where witnesses falsely denied having been promised benefits in exchange for their testimony and where it was necessary to grant relief. In Napue, a witness testified specifically that he had received no promise of consideration for his testimony when, in fact, the prosecution had promised to recommend a sentence reduction. Napue, 360 U.S. at 267. In Giglio, an assistant United States attorney promised a witness he would not be prosecuted, the witness subsequently testified falsely that no promise had been made, and the attorney stated falsely in summation that no promises had been made. Giglio, 405 U.S. at 151-52. In contrast to the

unambiguous and false statements involved in <u>Giglio</u> and <u>Napue</u>, the present case permits a reasonable interpretation of the witness's statement that is entirely consistent with the actual information exchanged between the prosecution and the witness.

Importantly, the summary in the present case was a reference to Moses's *own* statements. Although Pederson now argues that the summary improperly glossed over apparent inconsistencies or uncertainties found in Moses's statements to police or grand jury testimony, Pederson fails to acknowledge that the defense had access to the transcripts of the police statements and grand jury testimony and could have used them to impeach Moses's trial testimony, to the extent his actual testimony differed from his earlier statements. Further, Moses testified that he met with prosecutors repeatedly before Pederson's trial. He did not hide the fact of his trial preparation with the prosecution from the jury; he merely stated that the prosecutors did not tell him what to say. Accordingly, the present case is unlike <u>Banks v. Dretke</u>, 540 U.S. 668 (2004), a case Pederson relies upon heavily in this appeal. In <u>Banks</u>, the witness falsely stated that he never spoke with anyone about his testimony. <u>Id.</u> at 677. Given the differences, then, between the facts of <u>Banks</u> and the facts of the present case, <u>Banks</u> does not control. In short, we believe the state courts reasonably viewed the prosecutors' actions in this case as more akin to having a witness review transcripts than the nefarious act of planting false words in a witness's mouth. As such, we do not find that the Minnesota Supreme Court reached a decision that was "contrary to" or "an unreasonable application of" clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

Regarding the creation of a false impression, Pederson relies upon <u>Miller v. Pate</u>, 386 U.S. 1, 6 (1967) for the proposition that it is not sufficient for a prosecutor merely to avoid the use of false testimony, but that prosecutors cannot rely upon factually accurate evidence if that evidence tends to create a false impression in the minds of the jurors as to facts that are known to be untrue. We do not read the holding of <u>Miller</u> so broadly. In <u>Miller</u>, the objectionable information was a reference by the

prosecutor to a pair of shorts as "bloody shorts" when the evidence clearly established that the shorts were covered in paint rather than blood. Id. at 4-6. Miller, then, did not involve merely false impressions, but outright misrepresentations by a prosecutor. Pederson offers no other support for his position, and as such, we find the false impression claim to be without merit.

Pederson's claim that the prosecutor improperly vouched for Moses's credibility during closing arguments is similarly without merit. As noted, the parties dispute the proper standard of review as to this claim, and because relief is unavailable even under a de novo standard of review, we may apply that standard. Pederson argues that the prosecutor repeatedly emphasized the consistency between Moses's trial testimony and his prior statements and misled the jury into believing that Moses was credible and had a strong, firm recollection of his discussions with Pederson and Dean. The district court noted that the prosecutor attempted in closing to emphasize the consistency between Moses's testimony, the testimony of other witnesses, and the physical evidence. We agree with the district court. The prosecutor did, to a limited extent, discuss the consistency between Moses's testimony, his police statements, and his grand jury testimony, but the prosecutor also admitted that Moses's testimony was not entirely consistent with his earlier statements. In its entirety, the prosecutor's closing argument was not such that it "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Finally, even if we were to view the prosecutor's closing arguments as falsely and unfairly bolstering Moses's credibility, it is not clear to us that Moses's testimony was even necessary to support the conviction in light of the corroborating physical evidence and reasonable inferences the jury could draw based on Pederson's own narrative, his actions before and after the murder, and the balance of the evidence at trial.

D.    Juror Misconduct

"'The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law.'" Estelle v. Williams, 425 U.S. 501, 503 (1976) (quoting Coffin v. United States, 156 U.S. 432, 453 (1895)).  In the present case, however, there was no viable evidence to demonstrate Pederson was denied the presumption guaranteed by his Fourteenth Amendment right to a fair trial.  The only evidence tending to suggest that he might have been denied a presumption of innocence was the one purported juror response to the prosecution's questionnaire.  The Minnesota courts found, as a matter of Minnesota law and procedure, that the response could not be considered because it dealt solely with the internal deliberations and impressions of a juror.  This ruling was entirely consistent with federal law.  See Fed. R. Evid. 606(b) (prohibiting use of jury testimony and affidavits except in limited circumstances); Tanner v. United States, 483 U.S. 107, 117-27 (1987) (discussing the common law exclusion of evidence regarding juror deliberations, Rule 606(b) and the "long-recognized and very substantial concerns [that] support the protection of jury deliberations from intrusive inquiry").

The Minnesota Supreme Court found in the alternative that even if it could consider the juror response, relief was unavailable.  Pederson I, 614 N.W.2d at 731 n.2.  The Court stated that the statement,"I know a person is supposed to be innocent until proven guilty, but in reality it didn't work that way," could not be read in isolation, but had to be viewed in context:

> In addition to this statement, the juror also commented that she wanted the defendant to be not guilty, because while he made poor choices he did not seem to be a threat to society.  Further, the juror joined with the other members of the jury in voting to acquit appellant of two counts of first-degree murder.  Considering the juror's comments in this context and in the light of the verdicts actually rendered, it appears that while she

-20-

felt sympathy for the appellant, the evidence did not create a reasonable doubt as to the two counts of murder resulting in guilty verdicts.

Id.

Even if it were permissible to consider the juror response as evidence of misconduct, then, we agree with the Minnesota courts and the district court that relief would not be available. The juror's statement was not an unsolicited statement of the juror's views, but a response to specific questions such as "What were your impressions of [the defense attorney]?" The juror specifically criticized the defense attorney as the only one capable of preparing Pederson for trial and the only person capable of deflecting the impact of the prosecution's evidence against Pederson. While the juror's statement regarding a presumption of innocence is troubling on its face, it was not unreasonable to view the response as explaining that the defense needed to do more to counter the state's strong showing of guilt. As such, the Minnesota Supreme Court did not make an unreasonable finding of fact nor apply Estelle in an unreasonable manner when it held that the statement failed to show that the juror denied Pederson of a presumption of innocence.

For the reasons stated above, we affirm the judgment of the district court.

_____